## Case No. 4,761.

### Ex parte FIELD.

[5 Blatchf. 63.] [1]

Circuit Court, D. Vermont. Oct. 7, 1862.

---

[1] [Reported by Hon. Samuel Blatchford, District Judge, and here reprinted by permission.]

SMALLEY, District Judge. As both of the orders of the 8th of August are referred to, and as it is conceded that a portion of the first one must be borrowed and added to the one entitled "Persons discouraging enlistments, to be arrested," in order to constitute any pretence of excuse for disobeying the order of the court, made on the 1st of September. I shall consider them both in connection with the constitution of the United States, to which both must be subservient.

The constitution of the United States provides (article 1, § 9), that "the privilege of the writ of habeas corpus shall not be suspended, unless when, in cases of rebellion or invasion, the public safety may require it." Article 4th of the amendments to the constitution provides as follows: "The right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures, shall not be violated; and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." In article 5th of the amendments it is provided, that no person shall be "deprived of life, liberty or property, without due process of law."

The order first referred to in the return states, that it is made "by direction of the president of the United States," and assumes to direct all marshals and military officers of the United States, and authorize all police authorities, to arrest, &c. It further assumes to suspend the writ of habeas corpus in relation to all persons arrested for disloyal practices. Neither at the time this order was issued, nor at the time the proceedings were had upon this habeas corpus, had congress or the president declared that the public safety required that martial law should be established, or that the writ of habeas corpus should be suspended, in loyal states. It will not be pretended that Vermont is not a loyal state. She has been, and is, among the first and most earnest to aid and sustain the government in putting down the causeless and atrocious rebellion which is now distracting and desolating our hitherto happy country. She has furnished more men to fight the battles of the Union than any other state of equal population; and thousands of the best and bravest of her sons now sleep the sleep of death, in the swamps and on the battle-fields of Virginia, Maryland, and Louisiana. The petitioner is a citizen not subject to military law, his age, being over sixty, not only excusing, but excluding him from military service, unless by that order every citizen is subjected to martial law. If that order is to receive the construction the marshal claims for it, then more than thirty thousand men in the states of New England and in New York, many of them of very limited intelligence and of low moral character, were authorized to arrest any citizen within those states, from the lowest to the highest, without complaint, without warrant, and without even informing their prisoner by whom, or of what, he was accused. This order assumes to authorize each of the officers or agents to determine who are guilty of disloyal practices —a phrase hitherto unknown, and as yet undefined, in this country—and each to give his own construction to the term; and, if any one of these inquisitors pretends to think that a citizen has done or said anything which he chooses to consider disloyal, the poor unfortunate, though he may be the most worthy, loyal, and patriotic person in the community, may be thrown into prison, and deprived of all opportunity of being heard before a court or a jury to establish his innocence, or of being confronted with the witnesses against him, or of even ascertaining the offence with which he is charged. Those who claim to exercise this extraordinary power may be governed by whim or caprice, personal ill feeling, political or religious prejudice, the hope of pecuniary gain, or any other of the many unworthy motives which influence human action; and yet all classes of citizens, from the day laborer in the field, to the senator in the legislative halls of the country, are subject to this despotic power. None are exempt. If one person argues that General McClellan is the most suitable person to command the army, and another insists that General McClellan ought to be removed and some other general appointed, both persons are liable to arrest, according to the peculiar views of the different agents who hear or are informed of the discussion, because each will say that such expression of opinion tends to discourage enlistments, and is a disloyal practice. One argues that the Quakers ought to be subject to draft, while another insists that they ought not. Yet both are in the same danger. One claims that the principles and policy advocated by the New York Tribune for the prosecution of the war should be adopted and followed, while another denies it, and avers, as his opinion, that the policy indicated by the New York Herald should be pursued. Yet both are liable to be arrested by a partisan of the other, for discouraging enlistments. These illustrations might be extended ad infinitum.

This order was made, and the action under it was had, before any attempt was made to establish martial law. Can it be contended, that, with the construction claimed for it, it is not in direct violation of section 9, of article 1, of the constitution; and of article 4 of the amendments thereto, which declares, that "the right of the people to be secure in their persons, &c., shall not be violated," and that "no warrants shall issue but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched and the persons or things to be seized;" and of article 5 of the amendments, which declares, that no person shall be "deprived of life, liberty, or property, without due process of law?" If there be any force in language, it appears to me too plain for discussion, that either the constitution or the order must fall.

Our revolutionary fathers having, after eight years of desolating war, achieved their independence of the British crown, were so jealous of their liberty, and so determined to protect it against any future encroach-

ments of power, that they were not satisfied to leave it with the safeguards that appear in the constitution which was submitted on the 17th of September, 1787; but, in 1789, they submitted to the several states ten amendments thereto, which were duly ratified before 1791, in order to give more certain and complete protection to the liberty and rights of the citizen. How futile were all their efforts, if the doctrine contended for in this case is to prevail. That liberty which they held so dear, and guarded with such jealous care, has much less protection than it had under the British crown. If the arrest and detention in this case be sustained, it strikes a much more deadly and fatal blow to civil liberty, than did the general warrants which the British cabinet ordered to be issued against the printers and publishers of the North Briton, number 45, in 1763. The parties aggrieved in that case sought redress before that illustrious and fearless judge and protector of civil liberty, Chief Justice Pratt, (Lord Camden,) who held such warrants to be illegal, who liberated the notorious Wilkes from the tower of London, upon a writ of habeas corpus, and under whose instructions, British juries gave, in two cases, £300 damages each, whilst in the other two the counsel for the crown consented to a verdict of £200 each, rather than have them go to a jury. Leeman v. Allen, 2 Wils. 160; Huckle v. Money, Id. 205. In this last case, the defendant made a motion for a new trial, on the ground that the damages were excessive. After argument, Chief Justice Pratt said: "I shall now state the nature of this case, as it appeared upon the evidence at the trial: A warrant was granted by Lord Halifax, secretary of state, directed to four messengers, to apprehend and seize the printers and publishers of a paper called the North Briton, number 45, without any information or charge laid before the secretary of state, previous to the granting thereof, and without naming any person whatsoever in the warrant. Carrington, the first of the messengers to whom the warrant was directed, from some private intelligence he had got that Leech was the printer of the North Briton, number 45, directed the defendant to execute the warrant upon the plaintiff, (one of Leech's journeymen,) and took him into custody for about six hours, and during that time treated him well. The personal injury done to him was very small, so that, if the jury had been confined by their oath to consider the mere personal injury only, perhaps twenty pounds damages would have been thought damages sufficient. But that small injury done to the plaintiff, or the inconsiderableness of his station and rank in life, did not appear to the jury in that striking light, in which the great point of law, touching the liberty of the subject, appeared to them at the trial. They saw a magistrate over all the king's subjects,

exercising arbitrary power, violating Magna Charta, and attempting to destroy the liberty of the kingdom, by insisting upon the legality of this general warrant before them. They heard the king's counsel, and saw the solicitor of the treasury, endeavoring to support and maintain the legality of the warrant, in a tyrannical and severe manner. These are the ideas which struck the jury on the trial, and I think they have done right in giving exemplary damages. To enter a man's house by virtue of a nameless warrant, in order to procure evidence, is worse than the Spanish inquisition—a law under which no Englishman would wish to live an hour. It was a most daring public attack upon the liberty of the subject." A new trial was refused. That ruling was afterwards reviewed by Lord Mansfield, in Money v. Leach, 3 Burrows, 1742, and affirmed, against the crown, and has ever since been the settled law of England. Those warrants were not so arbitrary, and utterly repugnant to liberty and justice, as are the arrest and detention in this case. There the parties could resort to the writ of habeas corpus, if they felt aggrieved. The British ministry did not attempt to suspend that great writ of freedom. Is the British Magna Charta any more sacred than the United States constitution? Are the rights and liberties of the British subject any more securely protected than those of the American citizen? Even the French arrests under the "lettres de cachet," by which the Bourbons filled the prison of the Bastile, and thereby contributed so largely to the first French revolution, had more of the semblance of justice than the arrest in this case, for those letters named the person to be arrested, though they assigned no cause, and allowed no hearing.

If the language of this order of the war department could be considered without reference to the constitution of the United States, perhaps we might suppose that it was issued under the express direction of the president, and intended to suspend the writ of habeas corpus in the cases to which it refers. But, when it is considered in connection with the constitution, I can give it no such construction. I cordially adopt the language used by Judge Hall, of the northern district of New York, in the case of Ex parte Benedict [Case No. 1,292], where a person was arrested under the same order and brought before him on a writ of habeas corpus and discharged. After considering the order, in connection with the constitution, Judge Hall says: "My personal confidence in the integrity, patriotism, and good sense of the president, as well as the respect due to the high office he holds, compels me to require the most conclusive evidence upon the point, before adopting the conclusion that he has ever deliberately sanctioned so palpable a violation of the constitutional rights of the citizens of the

loyal states, as the order of the war department, thus construed, would justify and require."

The second order, entitled, "Persons discouraging enlistments, to be arrested," does not profess to be issued by the order or authority of the president, or to suspend the writ of habeas corpus, and it is only by borrowing two of the provisions of the first order, and appending them to the second, that the detention in this case, and the disobedience to the writ, can be pretended to be justified; for, even if the president possessed the delicate and dangerous power of suspending the writ of habeas corpus, it will hardly be claimed that he could delegate it to all or any of his subordinates, to be exercised when, in their discretion, the "public safety" might require it, any more than he could delegate the veto power. An order so entirely unprecedented, and so clearly in derogation of the common rights of the citizen, it is the duty of courts to construe most strictly. I cannot think, therefore, that it was intended, by itself, or in connection with the other, to have the operation which it is contended should be given to it or them.

Events which have transpired subsequently to the 1st of September, indicate very decidedly that the president did not intend that the orders should have any such construction. On the 6th of September, both of the orders of the war department, of the 8th of August, were rescinded; and, on the 24th of September, the president issued his proclamation, over his own signature, countersigned by the secretary of state, establishing, for reasons therein assigned, martial law over all the loyal states, and, as a consequence thereof, suspending the writ of habeas corpus. What effect should be given to that proclamation, I will consider hereafter. But the fact that the orders of the 8th of August, which, upon the construction claimed to be given to them, were broad enough to embrace every species of disloyalty, in word or act, were revoked in less than thirty days after they were issued, and that, eighteen days thereafter, the president issued his own proclamation in relation to military arrests and the writ of habeas corpus, is strong evidence, that he did not regard the aforesaid orders from the war department as emanating from him.

But there is another statement in the marshal's return to the writ, that is relied upon as a justification for disobeying it, which is this: "And said Baldwin says that he has informed the war department of the United States of the issuing of the writ, and he is instructed by said department to pay no regard to it, and not bring the body of said Field into court." The instructions here referred to were produced and read to me. They were in a telegram, which reads thus: "Washington, August 30th, 1862. To C. C.

P. Baldwin, U. S. Marshal: Pay no attention to the habeas corpus for the liberation of Lyman, Barney and Field, and, if any attempt be made to liberate them from custody, resist it to the utmost, and report the names of all who may attempt it. By Order of the Secretary of War. L. C. Turner, Judge Advocate." It is proper to take some notice of the tenor of this despatch. Though coming from a major in the war department, it is not addressed to a military officer, but to a civil officer, and one peculiarly the officer of the court, created for that purpose, to execute its bidding, and whose official oath binds him to do so. It peremptorily orders him to disobey the legal process of the court, and, if others attempt to enforce it, to resist them to the utmost. It contains an implied threat against the members of the bar, and other officers of the court, and even against the court itself, if either shall do anything judicially or professionally to liberate a prisoner, confined in jail upon what we have already seen was a despotic and illegal order of the war department. A more flagrant disregard of the constitution of the United States can hardly be conceived. That great organic law and charter of American liberty distributes the powers of the government into three parts, executive, legislative and judicial, each, in their respective spheres, independent of the others. The framers of that once sacred instrument took especial care, so far as human wisdom could provide, that the judiciary should be placed entirely beyond the control or influence of either or both of the other branches of the government, believing that, in its being so constituted, was one of the great safeguards of civil liberty. I deeply regret that such an order should go abroad, purporting to come from the war department, not on my own account, but because such illegal assumptions of power go far to bring our institutions and government into disrepute, both at home and abroad. I need not say to the people of Vermont, my native state, where my temper and conduct through life are well known, that threats will not influence me, nor that I shall do what I deem my duty, unawed. "If" (in the language of a great magistrate) "they had any effect, it would be contrary to their intent. Leaning against their impression, might give a bias the other way. But I hope and believe that I have fortitude enough to resist that weakness." At a very early stage of the rebellion, it became my judicial duty to express my views and opinions in relation to it, and the obligations of all loyal citizens; and thus they became widely known. I have had no change of opinion since, upon those questions, nor has any act or word of mine indicated any. In issuing this writ of habeas corpus, and in passing on questions raised upon it, I have simply performed an imperative judicial duty. If I had shrunk from it, or in any

way avoided it, I should have proved recreant to the great trusts reposed in me. A judge who will not faithfully and fearlessly perform every duty imposed upon him by the constitution and the laws, as much merits disgrace and punishment, as does the soldier who deserts his colors on the battle field.

There are other facts connected with the arrest and detention in this case, which deserve notice. At the last term of this court, it was determined that, when two or more persons were acting together in any way to discourage enlistments, it constituted an offence under the act of July 31, 1861 (12 Stat. 284), and, under a charge to the grand jury, delivered by Mr. Justice Nelson, an indictment was found against three persons, who are now held for trial thereon. This was well known to the marshal. He had no order from the war department to arrest any particular person, but only authority to arrest such as he chose. If he had reason to suspect that this petitioner, and the two others who were arrested with him, had been discouraging enlistments, he could have gone to a United States commissioner, and procured a warrant and had them brought up, and, if there was sufficient evidence, held for trial before this court; and it was his duty to do so. But, instead of performing his duty under the law, as an officer of this court, he volunteered, as a military agent, to make the arrest upon his own motion, and throw the accused into jail in violation of law. When he was before me on the 1st of September, he was reminded that, if the petitioner was guilty of the offence charged against him, he could and would be punished under the law; but he still chose to disobey the positive order of the court to bring the prisoner before it. This was a high handed, arbitrary exercise of power, without right, and in defiant violation of all constitutional authority and law, and of all civil liberty; and, if the power and majesty of the law are not to be trampled on with impunity, but are to be vindicated and maintained, as in times past, he ought to be and must be punished therefor.

In considering the character and extent of that punishment, it becomes necessary to inquire what effect is to be given to the President's proclamation of the 24th of September, 1862 (13 Stat. 730), which is as follows: "By the President of the United States of America. A proclamation. Whereas, it has become necessary to call into service, not only volunteers, but also portions of the militia of the states, by draft, in order to suppress the insurrection existing in the United States, and disloyal persons are not adequately restrained, by the ordinary processes of law, from hindering this measure and from giving aid and comfort in various ways to the insurrection: Now, therefore, be it ordered: First—That, during the existing insurrection, and as a necessary measure for suppressing the same, all rebels and insurgents, their aiders and abettors, within the United States, and all persons discouraging volunteer enlistments, resisting militia drafts, or guilty of any disloyal practice, affording aid and comfort to rebels against the authority of the United States, shall be subject to martial law, and liable to trial and punishment by courts martial or military commissions. Second—that the writ of habeas corpus is suspended in respect to all persons arrested, or who are now, or hereafter, during the rebellion, shall be, imprisoned in any fort, camp, arsenal, military prison or other place of confinement, by any military authority or by the sentence of any court martial or military commission. In witness whereof, I have hereunto set my hand, and caused the seal of the United States to be affixed. [L. S.] Done at the city of Washington, this twenty-fourth day of September, in the year of our Lord one thousand eight hundred and sixty-two, and of the Independence of the United States the eighty-seventh. Abraham Lincoln. By the President: William H. Seward. Secretary of State." Is the power thus assumed by the president conferred upon him by the constitution or any act of congress, or by both combined?

This is the most grave and important question that has ever been presented before the judicial tribunals of this country—one upon which eminent jurists have differed and upon which they will undoubtedly continue to differ. I approach it with great hesitancy and would be glad to avoid expressing an opinion upon it; but I have no choice. In order to examine it in all its aspects, it is necessary to consider the present condition of the Union. That a gigantic insurrection and rebellion has been, for more than eighteen months, and is still, raging in many of the states, and that the armies of the rebellious states have been, and are, invading loyal states with immense forces, that hundreds of millions of dollars have been expended, and many thousands of lives lost, in endeavors to suppress and put it down, and that hundreds of thousands of men are now in the field, and in hostile array against each other, we know to be true. That there are recruiting stations in nearly every town in the loyal states, and troops in various places in every state being drilled and disciplined, in squads, companies, and regiments, and that a draft has been ordered, we also know.

The constitution of the United States makes the president commander-in-chief of the United States army, and of the militia of the several states when called into the actual service of the United States. It also provides, that he shall "take care that the laws be faithfully executed," and that con-

gress shall have power "to provide for calling forth the militia, to execute the laws of the Union. suppress insurrections, and repel invasions." In pursuance of this authority, the act of the 28th of February, 1795 (1 Stat. 424), was passed, the 2d section of which provides, "that whenever the laws of the United States shall be opposed, or the execution thereof obstructed, in any state, by combinations too powerful to be suppressed by the ordinary course of judicial proceedings, or by the powers vested in the marshals by this act, it shall be lawful for the president of the United States to call forth the militia of such state, or of any other state or states, as may be necessary to suppress such combinations, and to cause the laws to be duly executed." The same act provides for organizing and governing the militia when so called out. and for establishing courts martial, &c. The question as to the construction of this act came before the supreme court of the United States. in the case of Martin v. Mott. 12 Wheat. [25 U. S.] 19. It was an action of replevin, for certain goods and chattels, brought in a state court of the state of New York. The supreme court of that state gave judgment against the avowant, and that judgment was affirmed by the court for correction of errors, and from thence was taken by writ of error to the supreme court of the United States. The opinion of the court was delivered by Mr. Justice Story, who says: "The avowry, in substance, asserts a justification of the taking of the goods and chattels to satisfy a fine and forfeiture imposed upon the original plaintiff by a court martial, for a failure to enter the service of the United States as a militia man. when thereto required by the president of the United States, in pursuance of the act of the 28th of February. 1795 (chapter 101). It is argued, that this avowry is defective, both in substance and form, and it will be our business to discuss the most material of these objections." "For the more clear and exact consideration of the subject, it may be necessary to refer to the constitution of the United States, and some of the provisions of the act of 1795. The constitution declares, that congress shall have power 'to provide for calling forth the militia, to execute the laws of the Union, suppress insurrections, and repel invasions;' and also 'to provide for organizing. arming, and disciplining the militia, and for governing such part of them as may be employed in the service of the United States.' In pursuance of this authority, the act of 1795 has provided." &c. "It has not been denied here, that the act of 1795 is within the constitutional authority of congress, or that congress may not lawfully provide for cases of imminent danger of invasion. as well as for cases where an invasion has taken place. In our opinion, there is no ground for a doubt on this point, even if it had been relied on,

for the power to provide for repelling invasions includes the power to provide against the attempt and danger of invasion, as the necessary and proper means to effectuate the object." "The power thus confided by congress to the president, is, doubtless, of a very high and delicate nature. A free people are naturally jealous of the exercise of military power; and the power to call the militia into actual service is certainly felt to be one of no ordinary magnitude. But it is not a power which can be executed without a correspondent responsibility. It is. in its terms, a limited power, confined to cases of actual invasion. or of imminent danger of invasion. If it be a limited power, the question arises, by whom is the exigency to be judged of and decided?" "We are all of opinion, that the authority to decide whether the exigency has arrived, belongs exclusively to the president, and that his decision is conclusive upon all other persons." Again, Mr. Justice Story says: "Whenever a statute gives a discretionary power to any person, to be exercised by him upon his own opinion of certain facts, it is a sound rule of construction, that the statute constitutes him the sole and exclusive judge of the existence of those facts. And, in the present case. we are all of opinion that such is the true construction of the act of 1795. It is no answer, that such a power may be abused, for there is no power which is not susceptible of abuse. The remedy for this, as well as for all other official misconduct, if it should occur, is to be found in the constitution itself." Mr. Justice Story states and disposes of another objection to the avowry, in these words: "In the first place, it is said, that the original plaintiff was never employed in the service of the United States, but refused to enter that service, and that, consequently, he was not liable to the rules and articles of war, or to be tried for the offence by any court martial organized under the authority of the United States. The case of Houston v. Moore. 5 Wheat. [18 U. S.] 1, affords a conclusive answer to this suggestion. It was decided in that case, that although a militia man. who refused to obey the orders of the president calling him into the public service. was not, in the sense of the act of 1795, 'employed in the service of the United States,' so as to be subject to the rules and articles of war, yet that he was liable to be tried for the offence under the 5th section of the same act, by a court martial called under the authority of the United States." The decision of the state court was reversed. and the case was remanded to it, with directions to cause a judgment to be entered in favor of the avowant.

This question as to the power of the president to call out the militia and establish martial law, was again before the supreme court of the United States in the case of Luther v. Borden, 7 How. [48 U. S.] 1. That was an

action of trespass for breaking open the plaintiff's house, in Rhode Island, and arresting him under a military order, growing out of what has been usually called the "Dorr Rebellion." The opinion of the court was delivered by that eminent jurist, Chief Justice Taney. After considering the question as to who should determine whether the exigency had arisen which would justify calling out the militia, the chief justice says: "After the president has acted and called out the militia, is a circuit court of the United States authorized to inquire whether his decision was right? Could the court, while the parties were actually contending in arms for the possession of the government, call witnesses before it, and inquire which party represented a majority of the people? If it could, then it would become the duty of the court, (provided it came to the conclusion that the president had decided incorrectly,) to discharge those who were arrested or detained by the troops in the service of the United States, or the government which the president was endeavoring to maintain. If the judicial power extends so far, the guarantee contained in the constitution of the United States is a guarantee of anarchy and not of order. Yet, if this right does not reside in the courts when the conflict is raging, if the judicial power is at that time bound to follow the decision of the political, it must be equally bound when the contest is over." "It is true," adds the chief justice, "that in this case the militia were not called out by the president. But upon the application of the governor under the charter government, the president recognized him as the executive power of the state, and took measures to call out the militia to support his authority, if it should be found necessary for the general government to interfere; and it is admitted in argument, that it was the knowledge of this decision that put an end to the armed opposition to the charter government, and prevented any further efforts to establish by force the proposed constitution. The interference of the president, therefore, by announcing his determination, was as effectual as if the militia had been assembled under his orders; and it should be equally authoritative." "It is said that this power in the president is dangerous to liberty, and may be abused. All power may be abused if placed in unworthy hands. But it would be difficult, we think, to point out any other hands in which the power would be more safe, and at the same time equally effectual. When citizens of the same state are in arms against each other, and the constituted authorities unable to execute the laws, the interposition of the United States must be prompt, or it is of little value. The ordinary course of proceedings in courts of justice would be utterly unfit for the crisis. And the elevated office of the president, chosen as he is by the people of the United States,

and the high responsibility he could not fail to feel when acting in a case of so much moment, appear to furnish as strong safeguards against a willful abuse of power as human foresight could well provide." The chief justice then examines the case of Martin v. Mott [supra], and says: "The grounds upon which that opinion is maintained are set forth in the report, and, we think, are conclusive. The same principle applies to the case now before the court. Undoubtedly, if the president, in exercising this power, shall fall into error, or invade the rights of the people of the state, it would be in the power of congress to apply the proper remedy. But the court must administer the law as they find it. The remaining question is, whether the defendant, acting under military orders issued under the authority of the government, was justified in breaking and entering the plaintiff's house." And, after examining matters as then existing in Rhode Island, he says: "It was a state of war; and the established government resorted to the rights and usages of war, to maintain itself, and to overcome the unlawful opposition. And, in that state of things, the officers engaged in its military service might lawfully arrest any one, who, from the information before them, they had reasonable grounds to believe was engaged in the insurrection; and might order a house to be forcibly entered and searched, when there was reasonable ground for supposing he might be there concealed. Without the power to do this, martial law and the military array of the government would be mere parade, and rather encourage attack than repel it."

The principle established by these cases determines, I think, that the president has the power, in the present military exigencies of the country, to proclaim martial law, and, as a necessary consequence thereof, the suspension of the writ of habeas corpus in the case of military arrests. It must be evident to all, that martial law and the privilege of that writ are wholly incompatible with each other.

But it may be argued that Vermont is a loyal state, more than five hundred miles from the seat of war; that the people are patriotic and law abiding; that the enforcement of civil law has not been interfered with within her borders; and that, therefore, there is nothing to justify martial law. But we have already seen that this is a question for the president, not for the court, to determine.

I am aware that the conclusion at which I have arrived may seem to conflict with some very high authorities, but it appears to me that they can be reconciled. In Ex parte Bollman, 4 Cranch [8 U. S.] 95, Chief Justice Marshall incidentally remarks, that only congress can suspend the writ of habeas corpus. And Judge Story, in his Commentaries on the Constitution (volume 3, § 1336), makes

the same remark. But neither was discussing the question, where, how, or by whom it could be suspended. It seems to have been an obiter dictum with both of those learned judges. The question came directly before Chief Justice Taney, in Ex parte Merryman [Case No. 9,487], and again before Judge Hall, of the northern district of New York, in Ex parte Benedict, before referred to. But both cases came up on an entirely different state of facts from that which now exists. The president had not then proclaimed martial law, and, in neither of the cases, was the act of 1795 referred to at all by the court, in its opinion. On the other hand, the president's legal adviser, (the attorney general,) Mr. Horace Binney, of Philadelphia, Mr. Reverdy Johnson, of Maryland, and Judge Parker, of Cambridge, Massachusetts, have, I understand, give deliberate opinions, that the privilege of the writ may be legally suspended without an act of congress. I have not had an opportunity of seeing the last named three opinions, and therefore do not know on what grounds they are based; but, coming from eminent lawyers and pure patriots, they are certainly entitled to great weight.

What, then, should be the order in this case? The writ of habeas corpus being now suspended, as to persons arrested as the petitioner was, if he were at this time before me, I should be constrained to order him back into the custody of the marshal. But, on the 1st of September, when the marshal was directed to bring him before me, he was legally entitled to the privilege of the writ; and, for disobeying that order, I shall direct the following sentence to be placed upon the records of the court, and shall use all the power the law confers upon me, to have it enforced: "District of Vermont. In the Circuit Court, October 7th, 1862. In the matter, Ex parte Anson Field [Case No. 4,761]. On the order on C. C. P. Baldwin, marshal, and N. B. Flanagan, jailor, to show cause why they should not be punished for contempt of court, in refusing to bring said Field into court in pursuance of the order of September 1st last, the court, having fully and carefully examined the matter in all its relations, and given it mature consideration, adjudges that said Baldwin was guilty of contempt of court in disobeying the order aforesaid, and that, within ten days, he pay to the clerk of the court a fine of one hundred dollars, and that, until he purges himself of said contempt, by complying with this order, he be not permitted within the court, to act as one of its officers; and that, the said Flanagan having acted as the mere servant of said Baldwin, he be discharged, as a vindication of the power of the law does not require that he should be punished."

The marshal having, in accordance with the order of October 7th, paid into the court the fine of $100, was restored by the court to his full privilege as an officer of the court.