### IN RE. NICHOLAS KEMP.

The power of suspending the writ of *habeas corpus* under the first section of Art. 9 of the constitution of the United States, is a legislative power and is vested in congress, and the president has no power to suspend the privilege of the writ of *habeas corpus* within the sense of that section of the constitution.

There is a distinction between the suspension of the privilege of the writ of *habeas corpus* under § 9, art. 1 of the constitution of the United States, and the right of a military commander to refuse obedience to it when justified by the exigencies of war, or that *ipso facto* suspension which takes place where war actually exists. Per DIXON, C. J., and PAINE, J.

That kind of suspension of the privilege of the writ of *habeas corpus* which comes with war and exists without proclamation or other act, is limited by the necessities of war, and applies only to cases where the demands upon the officer's time and services are such that he cannot consistently with his military duty obey the mandate of the civil authorities, and to cases arising within districts properly subjected to martial law, and may take place without the exercise of the power of congress under § 9, art. 1 of the constitution. Per DIXON, C. J., and PAINE, J.

Where martial law properly exists, it seems that civil magistrates would be bound to take judicial notice of its existence and of the consequent suspension of their powers, but in cases where a military officer would be justified in disregarding the mandate of the writ on account of military exigencies, he should if possible, make return of the facts showing his excuse. Per DIXON, C. J.

Military law, is the rules and regulations enacted by the legislative power for the

government and regulation of the army and navy, and the militia when called into active service. Per DIXON, C. J., and PAINE, J.

Martial law, is that control and government which a military commander may lawfully exercise over the persons and property of citizens and individuals not engaged in the land or naval service. Per DIXON, C. J., and PAINE, J,

The powers of the president as commander-in-chief of the army and navy in time of war, are strictly constitutional powers and are derived from the authority of congress to carry on war, and though not defined by the constitution, yet they are limited by the laws and usages of nations, adopted in their full extent by the common law. Per DIXON, C. J., and PAINE, J.

Martial law is restricted to and can exist only in those places which are the actual theater of war and their immediate vicinity, and it cannot be extended to remote districts, or those not immediately connected with the operations of the contending armies.

If in time of civil war the civil authorities of a district are able by the ordinary process to preserve order and punish offenses and compel obedience to the laws, martial law does not exist there, and the military commander has no jurisdiction, but if owing to the disloyalty of magistrates or the insurrectionary spirit of the people, the laws cannot be enforced and order maintained, then martial law takes the place of civil law in such district, wherever there is a sufficient military force to execute it.

The president has no power to prescribe offenses, or to make rules for the conduct of citizens in districts not subject to martial law, and enforce them by fines or other punishment by any form of trial whatever.

The proclamation of the president, suspending the privilege of the writ of *habeas corpus*, &c., dated Sept. 24, 1862, (General order of the War Department, No. 141,) is not a legal and valid exercise of executive power under the constitution and laws, and is void.

A citizen not in the land or naval service, or the militia in the active service of the United States, who discourages volunteer enlistments or forcibly resists a militia draft, cannot be punished therefor by a court-martial or military commission.

The constitution knows no "political" process or "political" cause of imprisonment, but in all cases of imprisonment there must be due process of law, and a legal cause of restraint, and the power to determine what is legal imprisonment and to discharge from that which is illegal, is, except where the writ of *habeas corpus* is lawfully suspended, conferred on the judicial department. Per DIXON, C. J., and PAINE, J.

That interference between the different departments of the government which is unauthorized and improper, is where one department denies to the others their appropriate powers and attempts to assume them itself. Per PAINE, J.

HABEAS CORPUS. On the 4th day of December, 1862, a writ of *Habeas Corpus* was issued out of this court and directed to General W. L. ELLIOTT, commanding the department of the North West, requiring him to have the body of *Nicholas*

*Kemp*, with the time and cause of his imprisonment before the court on the 16th day of December, 1862, to do and receive, &c. This writ was issued on the petition of John Deidrich, on behalf of said *Nicholas Kemp*, alleging among other things, his imprisonment at Camp Randall, in said State, by Brigadier General W. L. ELLIOTT, and that the cause of the arrest and imprisonment of *Kemp* was for being present at a riot which was said to have occurred at Port Washington, in the County of Ozaukee, on the 10th day of November, 1862, and that his imprisonment was illegal for the reason that he was not committed or detained upon the final judgment or order of any competent tribunal of civil or criminal jurisdiction, nor by virtue of any execution issued upon such judgment or order, nor upon any affidavit or written complaint against him for any offense against the laws of the state or of the United States, and that he had been wrongfully removed from the county in which said offence was alleged to have been committed, by an armed force to the city of Milwaukee and from thence to the city of Madison, where he was imprisoned as aforesaid.

The writ having been served, the respondent, Gen. ELLIOTT, sent to the clerk of the court as a return thereto, the following communication but did not produce the body of the said *Kemp* before the court as commanded by the writ: "Headquarters Department of the North West, Madison, Wisconsin, December 16th, 1862. To the Honorable Supreme Court, State of Wisconsin, Madison. In answer to writs in cases of *Nicholas Kemp*, arrested Nov. 12th, 1862, Joseph Hine, arrested Nov. 15th, 1862, Anthony Ablehausen (Ablheisen,) arrested Nov. 15th, 1862, served upon me on the 5th inst., I have the honor to state that Anthony Ablheisen was released on parole, Dec. 12, 1862, and that I hold the others above named in custody, by order of the President of the United States, they having been arrested at Port Washington, Ozaukee county, Wisconsin, by the special provost marshal for the state of Wisconsin. The authority for the said arrests

with the offense charged, is set forth in the enclosed papers marked "A" and "B." The President of the United States having on the 24th day of September, 1862, as announced in general orders No. 141, war department, adjutant general's office, Washington, September 25th, 1862, (copy of order herewith enclosed, marked "C,") suspended the writ of habeas corpus for offenses as charged against the aforesaid persons, with due respect to the supreme court, I decline releasing them from military custody. I am very respectfully, your obedient servant,    W. L. ELLIOTT, Brig. Gen., U. S. Vol. Comd'g Dep't."

"A." "State of Wisconsin, Executive Department, Madison, November 11th, 1862.    Walter D. McIndoe, Esq., Special provost marshal, for state of Wisconsin, Madison, Sir:  Information having reached this office of a violent interference with the draft of the militia, at Port Washington, in the county of Ozaukee, by a large number whose names are unknown to me, accompanied by the destruction of the boxes containing the names of those subject to draft, and personal violence to the commissioner duly appointed, and to other persons and property; I hereby authorize you to proceed immediately to Port Washington with a sufficient military force to enforce the draft, and arrest the leaders and aiders and abettors in the riotous proceedings referred to, as being included in the number of those subject to arrest and punishment under the provisions of the first section of the proclamation of the President of the United States, of Sept. 25, 1862. You will call upon Col. James M. Lewis, comd'g 28th reg't. Wis. vols., at Milwaukee, for the necessary military force. He has been ordered to place himself under your directions. You will be furnished within 48 hours with a duplicate list of all the men subject to draft in the several towns of Ozaukee county, and the number of persons to be drafted in each town, and on the receipt of such list, you are requested to aid such person as shall act as commissioner under general order No. 99, in proceeding with the draft. You will make publication

of the names of the persons drafted by posting them in con-
spicuous places in each town, or by publication in a newspaper
should its day of publication be within two days after the
draft ; and should the persons so drafted not appear at the coun-
ty seat on the day appointed, which day will be designated by
you in your notices at five days from the draft, you are re-
quested to proceed with such measures as are necessary to se-
cure their attendance forthwith at the county seat and trans-
portation to the camp of rendevous at Milwaukee.   You will
please communicate frequently with this office as to your pro-
ceedings.        Yours Respectfully,      EDWARD SALOMON,
                                    Governor of Wisconsin." .

"B." Headquarters special provost marshal, state of Wiscon-
sin, Madison, Dec. 5, 1862.      Brig. Gen. W. L. ELLIOTT, U. S.
Vols:   General, I am in receipt of yours of this date. I have
the honor to inform you, in answer to your inquiries, that
*Nicholas Kemp*, Joseph Hine and Anthony Alheisen, (supposed
to be Anthony Aulhauser, named in yours) were each arrested
by my order in the village of Port Washington, county of
Ozaukee, Wisconsin.   The cause of the arrest of said *Kemp*
and Hine was forcible resistance to the draft of the militia of
this state, then proceeding in said county by orders duly is-
sued by the war department of the United States and orders
from the Executive of the state of Wisconsin, issued in pur-
suance thereof.  The cause of the arrest of Ahlheisen, was the
use by him in public, at said Port Washington, during the
time of the proceeding of the draft aforesaid, of violent lan-
guage discouraging volunteer enlistments into the army of the
United States, and language opposing and tending to induce
others to oppose the draft aforesaid.

The authority for making the arrests above specified, was
derived from my appointment as special provost marshal for
the state of Wisconsin, dated Oct. 31, 1862, and the authority
contained in general orders of the war department No. 99,
dated Aug. 9, 1862; No. 140 dated Sept. 24, 1862, and No. 141

In re Kemp.

dated Sept. 25th, 1862, and the special instructions of the
Governor of Wisconsin, dated Nov. 11, 1862, a copy of which
last named document is herewith enclosed.    The persons in
question, together with a large number of others arrested at
the same time and place for similar acts, were by me delivered
to Major Gray, in command at that time of the 28th regiment
Wis. vols., at Camp Washburn, Milwaukee county Wisconsin,
Nov. 18th, 1862, in obedience to orders from the Governor of
this state, since which time I have had no official charge of
them.    I am respectfully, your obedient servant,

W. D. McINDOE, Special Provost Marshal, Wisconsin."

"C." "GENERAL ORDERS, No. 141. WAR DEPARTMENT, ADJU-
TANT GENERAL'S OFFICE, Washington September 25, 1862.
The following proclamation by the President is published for
the information of the army and all concerned:  'BY THE
PRESIDENT OF THE UNITED STATES OF AMERICA.    A PROCLA-
MATION.    Whereas it has became necessary to call into the
service not only volunteers but a portion of the militia of the
states by draft, in order to suppress the insurrection existing
in the United States, and disloyal persons are not adequately
restrained by the ordinary process of law from hindering this
measure and from giving aid and comfort in various ways to
the insurrection:  Now, therefore, be it ordered: *First.* That
during the existing insurrection. and as a necessary measure
for suppressing the same, all rebels and insurgents, their aiders
and abettors, within the United States, and all persons discour-
aging volunteer enlistments, resisting militia drafts, or guilty of
any disloyal practice affording aid and comfort to rebels
against the authority of the United States, shall be subject to
martial law, and liable to trial and punishment by courts-mar-
tial or military commissions.    *Second.* That the writ of *habeas
corpus* is suspended in respect to all persons arrested, or who
are now, or hereafter during the rebellion shall be imprisoned
in any fort, camp, arsenal, military prison, or other place of
confinement, by any military authority, or by the sentence of

any court-martial, or military commission. In witness whereof I have hereunto set my hand, and caused the seal of the United States to be affixed. [SEAL.] Done at the city of Washington, this twenty-fourth day of September, in the year of our Lord one thousand eight hundred and sixty-two, and of the independence of the United States the eighty-seventh. ABRAHAM LINCOLN. By the President, WILLIAM H. SEWARD, Secretary of State.' By order of the secretary of war, L. THOMAS, Adjutant General. Official, W. L. ELLIOTT, Brig. General U. S. A., Comdg. Dept. N. W." A copy of general order No. 99, war department, will be found *In re. Griner, seq.*

On the 22d day of December, the petitioner, by *Hugh Cunning*, his attorney, moved the court to quash the return of the respondent, and to enter a rule requiring him to produce the body of the petitioner before the court, by a day and hour to be fixed in that behalf, or that in default thereof an attachment issue, &c.

*E. G. Ryan*, for petitioner, submitted an able and elaborate argument in support of the motion, a synopsis of which he promised to furnish for this report, but it has not been received.

There was no appearance and no argument on behalf of the respondent.

On the 13th day of January, 1863, the chief justice and associate justices delivered their opinions on said motion, *seriatim*, as follows:

DIXON, C. J. The questions presented on this application are of the utmost delicacy and importance; and I cannot but express the regret, which I have always felt and which I feel now more than ever, that Congress has not, in the exercise of its undoubted power, (5 Wheat., 25, 71), withdrawn from the jurisdiction of the state courts, and committed to the exclusive decision of the federal courts, all cases arising under the constitution and laws of the United States. In times past this

omission has been the source of many perplexities, and some most unpleasant collisions between the courts of the two jurisdictions; and in the future, owing to the mistakes and possible prejudices of the state tribunals, may lead to serious embarrassments and most injurious delays in the exercise of proper federal authority. The case before us is purely of this character; it pertains to the power of the President, under the constitution and laws of the United States, in time of civil war, to suspend the writ of *habeas corpus*, to declare martial law, and to arrest and cause to be punished by the sentence of a court-martial or military commission, citizens charged with offenses against the laws and regulations of war. It goes one step further, it involves the power of the President to declare and punish as offenses, those acts which are not made such by act of congress. These are emphatically questions of federal cognizance, which must, in the last resort, be determined by the supreme court of the United States; and I repeat my regret that it has become my duty to decide upon them at all. I have however this encouragement, that for my errors there is a remedy, which though slow and sometimes embarrassed by state opposition, is nevertheless such as congress has seen fit to provide. And this consideration, that our decision is preliminary and not final—that we merely prepare the way for the determination of the court which can alone settle the law, will relieve me from that extended discussion of the questions which their gravity and importance would otherwise seem to demand. The only motives to such a discussion are, to show that I have not passed lightly over the grounds of my opinion —that I have not assumed to deny the legality of the acts of the President without a careful and deliberate examination of the whole subject; and these I must suffer to rest upon the assertion, that I have given the questions the fullest consideration that my time and limited opportunities would permit. I am also led to this course, because I cannot regard the principles involved as either new or doubtful. They are in my judg-

ment settled, so far as any matters of judicial inquiry can be said to be settled, before a court not authorized finally to determine the law for itself, by the uniform decisions of the courts and the concurrent opinion of eminent jurists and statesmen. I say matters of *judicial* inquiry, because I observe a distinction has been attempted by the present learned attorney general of the United States, between *judicial* questions and *political* questions. I question the soundness of that distinction, and, without particular criticism, feel myself obliged for the present, and until it has received the sanction of the federal supreme court, to disregard it. I am acting in a judicial capacity, and must be governed by the established rules and maxims of the courts.

I may furthermore add that the principles involved, have recently been the subjects of most profound and elaborate argument by several most able lawyers and judges. . I refer to the opinion of Chief Justice TANEY in *Ex parte John Merriman*, 9 American Law Register, 524; the article entitled *Habeas Corpus and Martial Law*, North American Review, October, 1861, pp. 471 to 519, supposed to be from the distinguished pen of Professor PARKER of Cambridge; the argument of Judge CURTIS of Boston, entitled "*Executive Power*," Pamphlet, Boston, Little, Brown & Co., 1862; and the opinion of Judge HALL of the Northern District of New York, *In the matter of Judson D. Benedict*. I might, under any circumstances, without repeating the arguments, content myself with a reference to these as a complete vindication of the conclusions at which I have arrived, and which I will proceed to state in as few words as possible.

And first, I think the President has no power, in the sense of the ninth section of the first article of the constitution of the United States, to suspend the privilege of the writ of *habeas corpus*. It is, in my judgment, a legislative and not an executive act; and the power is vested in congress. Upon this question it seems to me that the reasoning of Chief Jus-

tice TANEY in *Ex parte Merriman*, is unanswerable. And in saying this, I accept, as just, the strictures of Professor PARKER, in the article referred to, upon the decision there made. I agree that there is a plain distinction between the suspension of the writ in the sense of the clause of the constitution, and the right of a military commander to refuse obedience, when justified by the exigencies of war, or the *ipso facto* suspension which takes place wherever martial law actually exists, which the chief justice seems to have overlooked. But this kind of suspension, which comes with war and exists without proclamation or other act, is limited by the necessities of war. It applies only to cases where the demands upon the officer's time and services are such, that he cannot, consistently with his superior military duty, yield obedience to the mandates of the civil authorities, and to cases arising within districts which are properly subjected to martial law. In cases of the latter description, it is probable that the civil magistrates would be bound to take judicial notice of the existence of martial law, by which their functions are so far suspended; but as to the former, it would seem that the military officer should, if practicable, make return of the facts showing his excuse. The respondent in this case has made no such return; and this brings me to the next question.

Does martial law prevail at the present time in the state of Wisconsin? In using these words I adopt the distinction taken by Judge CURTIS, between military law and martial law; applying the former to those rules enacted by the legislative power for the government and regulation for the army and navy, and the militia when called into the actual service of the United States, and the latter to that government and control which military commanders may lawfully exercise over the persons and property of citizens and individuals not engaged in the land or naval service. Upon this question I entertain as little doubt as upon the other. I think it does not. The power of the President as commander-in-chief of the army and navy in

In re Kemp.

time of war, are strictly constitutional powers, so denominated by JOHN QUINCY ADAMS, who, I believe, has taken as broad grounds in favor of the powers of war as any American statesman or jurist. They are derived from the constitution in the authority given to congress to carry on war, and though not defined by that instrument, they are limited by the laws and usages of nations, adopted in their full extent by the common law of England (4 Bl. Com., 67,) and of this country. Of these laws and usages there is no principle better settled in modern times, as respects free or constitutional governments, than that martial law is restricted to those places which are the theatre of war, and to their immediate vicinity. Modified by the necessities of war, it is obvious it cannot operate beyond these bounds. The precise limits of the jurisdiction of the military commander, in cases arising near the scene of strife, may be a question for discussion, to be determined according to circumstances; but over remote districts, and those not immediately connected with the operations of the contending armies, all courts and writers concur in saying that martial law cannot be extended. The true test, in case of civil war, would seem to me to be, whether the civil authorities are able, by the ordinary legal process, to preserve order, punish offenders, and compel obedience to the laws. If they are, then the military commander has no jurisdiction; if, on the other hand, through the disloyalty of the civil magistrates or the insurrectionary spirit of the people, the laws cannot be enforced and order maintained, then martial law takes the place of civil law, wherever there is a sufficient military force to execute it. The resistance in which the petitioner was implicated was riotous, but not insurrectionary. Saving the definition of martial law, which I think too broad, preferring that given by Professor PARKER, at page 501, I commend the views of Judge CURTIS upon this question, not only for their general force and accuracy, but for the spirit of candor and sympathy for the national executive in these times of our trouble, and of patriotic

VOL. XVI—24

devotion to country, evinced by the learned author, which should characterize the criticisms of all loyal citizens.

The power of the president to prescribe offenses, or to make rules for the conduct of citizens in districts not subject to martial law, and to enforce them by fines or imprisonment by whatever form of trial, I think not a question for discussion. This power, whenever possessed by the Federal government, resides in congress. Whether under the fifth article of the amendments to the constitution, congress, declaring the offense, might have vested the jurisdiction in a court-martial or military commission, in the case of the present petitioner, I need not inquire. Nothing of that kind has been done, and he seems not to be charged with any offense known to the laws of congress.

These I believe to be the real questions presented; and in stating my convictions of the law, I desire to add that they are given without the slightest disrespect to the President, who has, in all his actions, been governed by the highest motives of patriotism, public honor, and fidelity to the constitution and laws. Penned at the gloomiest period of our public misfortunes, when over fifty thousand of the noblest of the land, answering the summons, had fallen a sacrifice to the cause of our nationality, when one division of the army of the Union, already most sadly repulsed, was threatened with complete overthrow by superior, almost irresistible numbers, and another, broken and wavering, was retiring before the restless and implacable foe—when the only way to national life, honor and peace, lay through the fire and blood of battle—and when, in response to a recent call for additional forces, instead of the utmost loyalty and patriotism on the part of every citizen of the loyal states, each asking where he could be most useful, or how he could best promote the welfare and safety of his country, there was reason to apprehend, in some quarters, factious and disloyal opposition ; the proclamation in question is not a welcome subject of criticism. As not unfrequently happens in

In re Kemp.

the affairs of war, it is easier, sometimes most painfully so, with time for deliberation, to point out mistakes after they are committed, than to see and avoid them amid the difficulties and dangers by which the military commander is at the moment surrounded. If, under these circumstances of national and executive embarrassment, the President has transcended his lawful authority, he has committed an unintentional error, which he will be the first to repair, and the last to vindicate. My duty, however, compels me to judge his acts, not by his intentions, but by the constitution and laws, giving a fair and reasonable scope to all the powers which they confer upon him.

It follows, that in my judgment, the return of General EL-LIOT shows no sufficient cause for the detention of the petitioner, or why he should refuse to produce his body before this court, but as the issuing of the attachment at the present time may lead to serious and most unfortunate collisions, which it is possible to avoid by a short delay, I deem it advisable, adhering to the precedent set by other courts and judges under like circumstances, and out of respect to the national authorities, to withhold it until they shall have had time to consider what steps they should properly take in the case.

COLE, J. It is impossible to overestimate the gravity and importance of the questions involved in this motion. They affect interests of so much magnitude, and of such general public concern, that they cannot but be approached with the utmost solicitude. Being sensible of their great importance, and of the possible consequences which might result from a decision of them against the respondent, I have given the case all the consideration and reflection I could command, since the matter was submitted.

The labor incident to a proper examination of the case has been not a little increased by the fact, that the court has not been favored with any argument in opposition to the motion to quash the return. It is very obvious that a full argument

and discussion of a cause upon both sides are most essential aids in arriving at correct conclusions upon it. Particularly is this so in one of doubt and difficulty, like the one before us. And it is to be regretted that the court could not have had the aid of such an argument on the part of the respondent, and been assisted by all the light which a full discussion of the questions involved might have thrown upon the case. But instead of this, we are compelled to examine the case with other public duties pressing us, and decide the gravest questions which can possibly come before any tribunal, upon an *ex parte* argument merely.

- I have not been able to write out my views upon all the points discussed by the counsel, who argued in support of his motion to quash the return, and for a rule that the respondent produce in court, on a given day and hour, *Nicholas Kemp*, or in default thereof, that an attachment issue against him, as for a contempt; and I shall now content myself by stating briefly the conclusions at which I have arrived upon one or two of the main questions raised by the motion, without any attempt at elaborate argument. My only effort will be to say only as much as may be necessary to make myself understood upon the points decided.

As an excuse for not producing *Nicholas Kemp* in court, according to the exigency of the writ of *habeas corpus*, to him directed, the respondent, General ELLIOT, makes return that he holds said *Kemp* in custody by order of the President of the United States, he having been arrested at Port Washington, in Ozaukee county, by the special provost marshal for the state of Wisconsin. From the communication of the provost marshal, which is made a part of the return, it appears that the cause of the arrest of said *Kemp* was, forcible resistance on his part to the draft of the militia of the state, then proceeding in said county by orders duly issued by the war department of the United States, and orders issued by the executive of the state of Wisconsin.

The authority for making the arrest in the first instance, and for now holding *Kemp* in military custody, is confessedly founded upon the proclamation of the President of the United States, dated September 20th, 1862, otherwise known as general order of the War Department, No. 141. If that order is valid to the extent which it is claimed inferentially by the return, it unquestionably affords a most ample excuse for General ELLIOTT's refusal to produce *Kemp*, in court according to the mandate of the writ. And the question is, can the order be considered as a legal and valid exercise of executive power under the constitution and laws of the land ? I frankly confess that I have been unable to see upon what legal grounds the validity of that order can be sustained. In saying this, however, I wish to distinctly disclaim all intention of attributing to the President, or any other officer of the state or general government, a purpose to assume and exercise powers not delegated by the constitution or laws of the land. I am unwilling to believe any such thing, and I have seen nothing which indicated any such design upon the part of any officer, state or national. The President and his constitutional advisers, when they issued this order, probably considered it legal, or at all events deemed it imperatively called for by the present condition of the country. The integrity and life of the republic were greatly imperiled. It was an occasion, if there ever was one in the history of any country, when the maxim, " *salus populi suprema lex*," most emphatically applied, and when, in the language of a great American statesman, a high executive officer might risk himself in going beyond the strict letter of the law, because the public preservation required it. But although the order might have been, and doubtless was, issued with the purest intentions and for the most patriotic purposes, and perhaps might be vindicated upon high moral and public grounds, I still think it is technically illegal. For it is clear that it is upon legal grounds alone that we can now consider it, and not upon the grounds of any imperious public ne-

cessity which the President might have thought justified him in making it. The correctness of the view I have expressed in respect to the legality of this order, will become apparent when we consider its contents. In the first clause of the order, it is among other things, declared that all persons discouraging volunteer enlistments or resisting militia drafts, (in other words committing the acts with which *Kemp* is charged,) shall be subject to martial law, and liable to trial and punishment by courts-martial or military commission.

Now, however reprehensible and disloyal in every point of view such acts may be, yet I am unable to understand upon what principles it can be maintained, that the citizen who commits them thereby renders himself liable to martial law, and liable to be punished by a court-martial or military commission. And it seems to me that to hold that citizens of this state, as a consequence of the commission of such disloyal acts, become liable to be tried and punished by courts-martial, is to ignore and render void all the guaranties of personal rights secured by the constitution. I cannot look upon it in any other light. I am not aware of any act of congress which provides that such offenses are punishable by courts-martial, nor have I found any act of congress which even attempted to confer upon the President, or any other officer of the government, the power of subjecting a citizen, not connected with the land and naval force, or the militia in actual service, who might commit such offenses, to martial law and trial by a military commission. Chapter 201, Laws of the United States, approved July 17th, 1862, under which, it would seem, the President proceeded in making the present draft, does not declare that the act of discouraging enlistments or resisting militia drafts shall subject a party to martial law and trial by court-martial. The most that can be claimed for that act is, that by the first section, the President was authorized, when there were any defects in existing laws or in the execution of them in the several states, to make all necessary rules and regulations for the

enrollment of the militia and for making the draft. The President was vested with discretionary power to remedy defects in existing state laws, in respect to the enrollment and calling out of the militia. The power evidently relates to the carrying out and executing the draft in its details, and cannot be said to give the President authority to subject a citizen to trial and punishment by court-martial for resisting the draft. This law, then, does not make resistance to a draft by a citizen, an offense triable and punishable by the military authorities. Nor does it confer upon the President the power to make it punishable in this manner. Resistance to the draft might have . been punished by the civil authorities, perhaps, but could not, under this law, render the citizen amendable to a court-martial. Nor am I aware of any other act of congress from which it can be claimed that the President is given the extraordinary power of declaring certain offenses committed by a citizen, triable by martial law. Whether congress could confer upon the President any such power, it is not necessary now to discuss. It would seem to be a clear case of the delegation of the legislative power on the part of congress. But however this may be, it is a sufficient answer that congress has not itself made, nor authorized the President to make, resistance to the draft on the part of the citizen, an offense punishable by courts-martial. See the case of *Smith vs. Shaw*, 12, Johns., 207.

It may be argued that the President derives this power, from another source. He is the commander-in-chief of the army and navy of the United States, and of the militia of the several states in actual service, and by virtue of this high office, it may be said, he has power to subject citizens to the operation of martial law in time of war. It is fully admitted that a state of war clothes the President with vast powers over the person and property of the citizen. And that the government of the United States is now engaged in carrying on a great war against certain rebellious states, is painfully true. I have no disposition to restrict in the least, the great powers which such a state

of public affairs confers upon the President.     He has vast responsibilities resting upon him, and must have corresponding powers to discharge them.     He is commander-in-chief of the army and navy, and is intrusted with the chief duty of carrying on the war.     In its prosecution he is clothed with all the vast, undefined power of a military commander, and may conduct hostilities according to the laws and usages of war.     All this is fully conceded.     Undoubtedly the President, or any general under him, may, when it is deemed necessary for the successful prosecution of military operations, declare martial law over rebellious states, or over districts in a state of war, and within those limits, subject all persons and things to its operation.     In places where hostilities exist, the military authority often declares martial law, which during its continuance, supersedes and puts in abeyance all civil authority. This is of frequent occurrence, and is a legitimate exercise of the war power.     And when martial law exists, it must be supreme in order to be effectual.     It cannot co-exist with the civil power; if it does, the latter must be in entire subordination to it.

But what are the proper limits to the existence of martial law, or how far it extends territorially when once declared, is a point upon which there is much conflict of opinion.     Some authorities say its . operation is restricted to the limits of the camp, or to the lines of the actual occupation of the army.     See the opinion of Justice WOODBURY, and the authorities referred to by him in *Luther vs. Borden*, 7 How. (U. S.), 1.     But I shall not attempt to define any precise limits to the territorial operation of martial law when once declared.     For although the President, or any military commander under him, may declare martial law in states and districts which are the theater of war, and may subject all persons and things to its operation, yet it does not follow that martial law may be extended over districts and states not the field of strife and conflict.     Martial law may be necessary, and therefore justifiable, in the states of Virginia, Kentucky, Missouri, and other states where actual

war exists, and yet not be necessary in other states. Wisconsin is not the theater of war, but fortunately far removed from it. The civil authorities here maintain themselves. Justice is dispensed by the courts; the laws are administered without difficulty; and no necessity can exist for subjecting the citizen to the control of military power. In this state of things, can it be said that martial law can be declared or becomes necessary here? It seems to me not. If *Kemp* has violated any law, state or federal, he is amenable to the civil authorities, and should be turned over to them for trial and punishment. And it is no sufficient answer to say that certain states are in rebellion, and that a great war is being prosecuted to restore the national authority over them, and therefore all states and districts must be subjected to the operation of martial law. Such a principle is dangerous to constitutional governments, and cannot be sanctioned. Wherever war exists, there martial law may be declared. But it must be confined to fields of strife and actual conflict, and cannot be extended to states not the theatre of military operations. Upon these principles I am constrained to hold that the President could not, by virtue of the power vested in him as commander-in-chief of the army and navy, subject the citizens of this state to martial law, or render them liable to be punished by military commission for resisting the enforcement of the draft, however reprehensible and disloyal such acts may be. This, I think, will be the settled judgment of the country when the question is fully understood.

But it may be said, conceding this position to be sound, still, as the President in the second clause of the order has declared that the writ of *habeas corpus* is suspended in respect to persons arrested, or who may be thereafter imprisoned or confined, by any military authority; the court cannot, by means of that writ, inquire into the cause of the restraint of *Kemp*. And this brings up for consideration the question whether the President can suspend the privilege of the writ in respect to all

persons held under military control.   In other words .the inquiry is, whether, under the constitution, the suspension of the writ is a legislative or executive act.  It appears to me that it is the former.   To suspend, annul or take away a right given by law, is, under our system of government, essentially a legislative function.   To deprive a citizen of the privilege of the writ of *habeas corpus*, is to take from him one of the highest and most sacred rights secured to him by the constitution and laws of the land.   It is a change of the law which from the nature of things, belongs to the power which can make the law.   I do not now refer to the case where the President may declare martial law.   When he does this, it is by virtue of the war power.   And where martial law prevails, it destroys, for the time being, all civil authority and every legal right.   This is admitted.   But the inquiry is, can the President suspend the writ of *habeas corpus*, or must it be done by an act of Congress.   I think it involves pre-eminently the exercise of legislative power.   There may be cases where, for the best of reasons, the President might refuse to make return to a writ. Such. cases have occurred during the progress of the rebellion, and doubtless will occur again.   But I do not refer to such a case.   The inquiry is directed to the point, whether the constitution confers upon President, or Congress, the power to suspend the writ in cases of rebellion or invasion, when the public safety may require it.   I think the power is given to Congress. But I shall not attempt further discussion of the question. The whole argument has been exhausted by the public press, in the debates in Congress upon this subject, and by various judicial authorities which have examined the question.   To my mind the decided weight of authority, as well as force of reason, are upon the side of those who deny the right of the President to suspend the writ.    And with this remark I pass from the point.

It follows from these views that the return of General ELLIOT must be held, as a matter of law, insufficient.   But while de-

ciding this, I am equally clear that the rule moved for should be denied.   General ELLIOTT is undoubtedly acting under the orders of his superior officers.   He will doubtless refuse to produce *Kemp* in court.   If an attachment issues, it must necessarily bring on a conflict between the state and federal government.   This is to be avoided if possible.   It is not to be assumed that the proper authorities at Washington will not obviate all occasion for such a conflict, when they are informed of the result of this decision.   They will undoubtedly review their action, or take such steps in the premises as may be consistent with justice and public tranquility.

PAINE, J.   A writ of *habeas corpus* was issued, directed to W. L. ELLIOTT, Brigadier General, commanding the department of the north-west, requiring him to produce the body of *Nicholas Kemp*, with the cause of his imprisonment.   A return has been made setting forth, that the prisoner was arrested by the special provost marshal of this state, for alleged violent resistance to the draft in Ozaukee county, in pursuance of general order, No. 141, of the war department and of a letter of instructions from the governor of this state.   The respondent also declines to produce or discharge the prisoner, upon the ground that the writ of *habeas corpus* is suspended as to persons charged with this offense, by the proclamation of the President which constitutes said order No. 141.   Upon this return the counsel for the prisoner move for an attachment to compel obedience to the writ.

Two questions are presented:   First, is the writ of *habeas corpus* legally suspended?   Second, if not, does the return show any sufficient reason why the writ issued should not be obeyed.

No judicial officer can be called on to decide these questions at this time, without a deep sense of the solemn responsibility resting upon him.   Our government is struggling with a malignant rebellion which threatens its existence.   Those to

whom the duty is entrusted, are using all their powers, as they must necessarily, for its protection. And in addition to the ordinary powers in time of peace, they are called on to wield the extraordinary and terrible powers which belongs to war No loyal man questions the right or propriety of their doing this. On the contrary, every one would uphold them in it to the extent of his ability. The constitution as clearly confers the war power on the government as it does any other ; and it is idle either for the advocates or opponents of that power to contend that its legitimate exercise in any violation of that in-strument. It is true that many of the safeguards and barriers which the constitution has provided for the protection of pri-vate rights in time of peace may, for the time being, be sus-pended or broken down by the war power. But it is wholly unwarrantable to say from this, that the exercise of that power is a violation of the constitution ; for the instrument itself in-tended that this exact result might be produced when the emergency required it. It gave the power for that purpose. Its exercise is therefore no violation of the constitution, but is merely giving effect to a special purpose of paramount im-portance, to the exclusion, for the time, of a general purpose ; it being impossible to accomplish both at the same time. So far, although there has been much confusion of ideas in some of the discussions upon the subject, there seems to be no rea-sonable ground for any difference of opinion. But what acts may legitimately be done in the exercise of the war power, and where certain powers are lodged which are conceded to exist, are questions of very grave and vital importance, and upon which, as was perhaps naturally to be expected, wide differences of opinion seem to prevail.

In determining such questions it must not be forgotten, that in times like these there are other dangers to be apprehended besides the success of the rebellion. All history teaches the danger of entrusting unlimited power to any man or men; the danger of allowing the military authority to supersede the

civil; the danger that acquiescence in the exercise of extraordinary and illegal powers, when used for a good end, may constitute a precedent by which bad men will be afterwards be enabled to use these powers, for the destruction of the rights and liberties of the people. Constitutions are based upon this experience, and keep this danger constantly in view.' And while designing to confer upon governments and public officers such powers as are necessary, they at the same time endeavor to guard against their abuse, and the assumption of powers not conferred, by establishing limitations and boundaries as clear and well defined as the nature of the case will admit. The mass of men, both in peace and war, are generally willing enough to acquiesce in any power calculated the most readily to accomplish some object of present desire. They are not apt to inquire very carefully after any limitations upon that power, or to consider the ultimate results to which its establishment may lead. This tendency, so common in the people, often manifests itself in the legislative departments, sometimes in the executive, and sometimes also it has undoubtedly influenced the decisions of judicial tribunals. But wherever the latter has been true, they have failed to perform their true function. It is the special duty of those tribunals to guard the constitution against all encroachment from any quarter, and faithfully to enforce and maintain those limitations which the people themselves, in the exercise of their most deliberate judgment, have placed upon the powers conferred upon the government and its officers. It may be that in times like these, their voice will not be heeded by those having armies under their control. But whether it be so or not, a judge, so long as he is left at liberty to act at all, can decide only according to the constitution and the law. He has no other alternative. And if in acting upon this case, as I am obliged to, I am compelled to differ from the President of the United States as to the validity of certain powers which he has claimed the right to exercise, I shall have the consciousness that I have endea-

vored as faithfully to discharge my duty, as I believe he has endeavored to discharge his.

Whether the writ of *habeas corpus* is legally suspended or not, depends entirely upon the question, whether it requires an act of congress to suspend it, or whether it may be done by the President alone.   And this has recently been so fully and ably discussed, that whoever is now called on to decide it, can do little more than to indicate which side of the argument he adopts.   For myself, I entertain no doubt that it requires an act of congress.   The power to issue the writ is given by law. It requires a law to change a law, and the President cannot make a law.   This argument, derived from the nature of the act to be done, and that derived from the fact that the prohibition is found in the article of the constitution relating to the legislative power, and among other prohibitions which are acknowledged limitations upon that power; are so clearly stated in the recent opinion of Chief Justice TANEY in the *Merriman* case, that it would be repetition to go over the same ground .

Before adopting this conclusion, I have not neglected to examine such arguments on the other side as I could obtain ; I have carefully read the elaborate article on the " The Habeas Corpus and Martial Law" in the October number of the North American Review for 1861, which is a review of Judge TANEY's decision, and is understood to have been written by Judge PARKER of Boston.   I can assent to most of the positions of that article.   It contends, with great force, that in war a military commander may sometimes declare and enforce martial law, and may justifiably disregard a writ of *habeas corpus*, when obedience to it would necessarily interrupt and hinder him in the discharge of important military duties.   This may well be conceded.   But I cannot consent to the writer's conclusion, that this kind of justifiable disregard of the writ, growing out of the existence of martial law, or the local and temporary necessities of military duty, amount to the suspension referred to by the constitution, and a single supposition

will show this. The constitution provides that the privilege
of the writ shall not be suspended "unless when in cases of
rebellion or *invasion* the public safety may require it." Now
it will scarcely be denied that the word "invasion," as here
used, means only an invasion of our own soil, and would not
include an invasion by us of the territory of an enemy.
This seems to me so obvious that I will spend no time upon
it. Suppose, then, we were engaged in a war which was car-
ried on entirely on the soil of the enemy, as in the late Mexi-
can war. Suppose we had an army there in imminent peril, and
it was necessary to send reinforcements immediately. A
military commander is ready to march or sail with these
reinforcements, and a *habeas corpus* is issued and served upon
him for the purpose of obtaining the discharge of one of his
soldiers, to obey which would delay the whole expedition.
Would he not be justified in disregarding it? Clearly he
would, by the same reasoning which this writer uses. There is
no material distinction, in this respect, between a case where
the military movement is designed to be completed on our own
soil, and one where it is intended to invade the soil of the
enemy. They may be equally important, the necessity for
immediate action equally pressing in both. And yet, if this
writer is correct in the position, that this kind of disregard of
the writ constitutes the suspension which the constitution had
in view, the commander ready to march with reinforcements to
save our army from destruction on a foreign soil, would be
required by the constitution to obey the writ, make his return
and await a trial, at the expense of delaying the whole expe-
dition. There being no invasion of our soil, and no rebellion,
if the constitution had reference to this power of a military
commander, it would require him imperatively to obey the
writ in the case supposed, at the sacrifice, perhaps, of our
success in the war.

These considerations convince me, beyond any doubt, that
it was not this military power that the constitution had in view,

and upon which it imposed the prohibition.   On the contrary, it left the *habeas corpus* to be affected by the occasional exercise of this power, based upon an existing necessity, in the same manner that other civil process might be affected.   Thus, suppose a general about to engage in battle, or to make some military movement requiring immediate action, and a civil officer should come with a writ of *replevin*, to seize his artillery horses, or any other personal property equally essential to his success, under a claim that the property had been stolen from the true owner and sold to the govermnent by a person who had no title.   Would not the commander be justified in disre garding the process, just as he would a *habeas corpus?*   Clearly so, and by the same reasoning.   He might even seize such property from the owner, in a pressing emergency, and disregard all attempts to recover it by civil authority.   Such are the necessities of war, growing out of the execution of actual military operations.   And many more instances could be readily stated, where commanders would be justified in this kind of disregard of civil process.   The constitution makes no attempt to limit this power in respect to any other process, and I think it made none in respect to the writ of *habeas corpus.* It left that to be superseded by martial law wherever martial law was properly declared by a military officer, just as all other civil authority was for the time suspended by it.   It left it to be disregarded where obedience to it must defeat the performance of some military operation, just as other process might be disregarded upon a similar necessity.

But there may be at times, a necessity entirely distinct from all this, why the officers of the government should be relieved from being called to account by the writ of *habeas corpus*, and being compelled to show a good legal cause for imprisoning every person whom they hold.   There may be times in a rebellion, when, even in states professedly loyal, and which are not the theater of war, the atmosphere may become pestilent with treasonable sympathy.   There may be well grounded

suspicions of guilt, but no overt act capable of being proved. Sedition and disaffection may be paralyzing the vital powers of the government, without perhaps violating any known law. There may be probable cause to believe that disaffection is about to develop into actual crime. The rattle of the serpent may be heard in the air, but owing to his concealment, the exact point at which the blow to crush him should be aimed, may not be known. In such cases it may be necessary for the public safety, that the government should be permitted to strike swiftly and somewhat at random. There may be no martial law prevailing, no military exigency which would deprive the officer of time to make return to a writ and await a trial. Disobedience, therefore, could not be justified upon these grounds. Yet if liable to be called to account and required to show a sufficient legal cause for every imprisonment, the power of the government to defend itself by preventing and intimidating treason, might be to a great degree impaired.

It was to meet this necessity that the constitution allowed the writ to be suspended in cases of invasion or rebellion when the public safety required it. It is based upon two assumptions. First, that judicial tribunals, so long as the writ is not suspended, are compelled to issue it on proper application, and to decide upon the legality of the imprisonment according to the existing law. Second, that the public safety, may in the excepted cases, sometimes require that the officers of the government should be relieved from such inquiry. To accomplish this, the writ must be suspended; and the question is, where was the power lodged?

From its very nature it would not naturally have been entrusted to a single man, and that man at the head of the military. It is a power dangerous anywhere. It delivers over the nation, for the time being, to the control of the executive. It makes him substantially what the Roman Dictator was. No single officer should be allowed to assume such powers upon

his own judgment only. The nation that is to be subjected to them, should have some voice in determining when the necessity arises for their existence. And as in Rome, there was no officer who could assume the power of a Dictator upon his own judgment, but such officer had to be appointed by a vote of the senate, so here, the power to suspend the writ of *habeas corpus* would naturally have been entrusted to the legislature and not to the executive alone. There the constitution has, placed it. So the supreme court of the United States has declared. So it has been held by every judicial decision, and every elementary writer on constitutional law.

The people, in adopting the constitution, added an amendment, article 3, which provided that no soldier should be quartered in any house in time of war, except "*in a manner to be prescribed by law.*" Can it be possible, that a people who were thus careful to guard themselves against the uncontrolled judgment of military officers in one particular, could have in-intended to leave those officers the power to seize and imprison all citizens, and suspend their ordinary legal remedies, without any law declaring the existence of such a necessity?

I have read the letter of the Attorney General of the United States upon this subject, in answer to a resolution of the House, dated July 5th, 1861. I am compelled to say, that its reasoning seems to me wholly unsatisfactory. He claims the power for the President, and through him for his subordinate officers, to refuse obedience to the writ without any act of congress suspending it. His argument, if I understand it, and I have endeavored to do so, is to a great extent based upon the following propositions. He says, first, that the executive is one of the co-ordinate departments of the government. He next asserts the general doctrine, that these departments are co-equal, each independent in the exercise of its own functions. And then upon these propositions he bases, what seems to me the extraordinary conclusion, that for the judicial department to call upon the executive or his subordinates, by the writ of

*habeas corpus*, to show by what authority they imprison any person, is an improper attempt to interfere with the executive department, which may be justly disregarded by the President or any officer acting under his directions.

The propositions relied on are undoubtedly, in a general sense, true. But that they could ever have been conceived to have such an extent and application as is here claimed, I should, before seeing this letter, have thought impossible. The several departments are co-equal, and each in the exercise of its own duties, independent of the others. But it by no means follows that the duties of each cannot be effected, regulated or even prescribed by the others. On the contrary, it is clear that all this may, and ordinarily does take place. The executive calls the legislature together. It is their duty to obey that call; but that is not yielding to any improper attempt by the executive to control the legislature, for the power to call them together is his appropriate function. So the legislature enacts laws, prescribing duties for the executive to perform ; prescribing also duties for the judicial department, and regulating its modes of action. This is no attempt to interfere with the freedom of these departments; for to do these things is the province of legislation. And by precisely the same reasoning, when the executive or any of his officers is called on to obey a writ of *habeas corpus*, and show by what right he imprisons any person, there is no improper attempt to interfere with the executive department, because the power to issue such writ and to decide upon the legality of every imprisonment, is the special and peculiar function of the judiciary. Each department, therefore, while free and independent in its own sphere, must respect and give due effect to the appropriate functions of the others, and this is all that would be done by the President and his officers in obeying the writ of *habeas corpus*.

The argument, if good at all, is as good in peace as in war. For the departments are as free and independent in one case as in the other. And if to call on the President and his offi-

cers to show cause for the imprisonment of any person, is an unwarrantable attempt by the judicial department to control the executive, in time of war, it would be equally so in time of peace ; and the result wou'.d be an absolute and perpetual exemption of those officers from all obligation to obey the writ. I had not supposed it necessary, at this day to contend against such a proposition. That interference which is really improper between the different departments, is where one denies to the others their appropriate powers, and attempts to assume them itself. Such would be the case should the President assume the legislative power, of suspending the laws, or the judicial power of deciding upon the legality of imprisonment.

The Attorney General repeats the saying often heard, that that the liability of a power to abuse is no argument against its existence, inasmuch as all power may be abused. This may be true. But where the danger of abuse is infinitely greater if entrusted to one man, that is a good reason why, as a matter of policy, it should not have been entrusted to him, and why, as a matter of law, it should be held to belong to the legislature, if the constitution placed it there.

The remainder of the Attorney General's argument is based upon the general necessity of suppressing the rebellion, to which I may have occasion hereafter to refer, and upon the necessity arising from the prevalence of martial law and the exigencies of military duty to which I have already referred, and while admitting that they may justify an occasional temporary disregard of the writ, as of all other civil authority, and have endeavored to show that this did not constitute the suspension contemplated by the constitution. That conclusion seems to me also to be clearly indicated upon the face of the provision itself. It evidently assumes that except for its existence, the writ might be suspended at any time. Now it would hardly be claimed by the most extravagant asserter of executive power, that the President could suspend the writ in time of peace. Yet the prohibition evidently assumes that the power

on which it was imposed, might do so.    Hence it had reference to the legislative power.

For these reasons, although the proclamation of the President professes to suspend the writ, I cannot regard it as legally entitled to that effect.    The writ not being suspended, the remaining question is, whether any reason is shown why the court should not proceed as far as its own power will extend, to enforce obedience to it in the ordinary way?    I can see no such reason.    If the return which has been made showed on its face a legal custody of the prisoner, I think there can scarcely be a doubt that it would be our duty to require obedience to the writ by a production of his body in court.    For he might desire to traverse the return, and he could hardly proceed in the case without being first produced.

But even if this were not so, the custody in which the return shows the prisoner to be now held is wholly illegal. It is not claimed that he was a drafted man, or that he belonged in any way to the military or naval service of the United States.    It is not claimed that he has violated any law of the United States.    For though congress might, upon the principles which have been applied and acted upon in respect to the criminal jurisdiction of the federal government, pass a law providing for the punishment before the civil authorities, of any person resisting a draft, yet it has not done so.    And if it had, that would not legalize the present custody of this prisoner.    He is charged with a riot, which is a crime only against the laws of this state. The conduct of the governor in promptly sending a military force to quell this riot, was highly proper and commendable.    All officers, civil and military, state and federal, should be unusually vigilant in times like these, and co-operate to aid the government in its struggles against treason.    Parties engaged in this riot rendered themselves liable to be shot if necessary to quell it.    They rendered themselves liable to arrest by those engaged in quelling it.    But after it was quelled, they could be held only in legal custody,

to be proceeded against according to law.    And the question is, what law?    The proclamation of the President says, according to martial law.    But I think the constitution provides otherwise.

One of the prominent matters in controversy between the people of England and their kings, was the right to try citizens, not connected with the military service, by courts-martial. The monarchs had asserted and exercised this right, and the people resisted it, and compelled the monarchs to abandon the claim.    See *Grant vs. Gould*, 2 H. Blackstone's Rep., 69, in which case Lord LOUGHBOROUGH, in delivering the opinion of the court, said:    "Where martial law is established and prevails in any country, it is of a totally different nature from that which is inaccurately called martial law,  merely because the decision is by a court-martial,  but which bears no affinity to that which was formerly attempted to be exercised in this kingdom, which was contrary to the constitution, and which has been for a century totally exploded."    Our fathers, not unmindful of this struggle, nor of the facilities which the existence of such a power would furnish for the destruction of the liberties of any people, guarded against it by article 5 of the amendments to the constitution, which provides that "no person shall be held to answer for a capital or otherwise infamous crime, unless on a presentment or indictment of a grand jury, *except in cases arising in the land or naval forces, or in the militia when in active service in time of war or public danger.*"

It cannot be said that this provision relates only to times of peace, and that it may be disregarded in times of war; for by its express terms, it includes times of war as well as peace. For the President, therefore, to proclaim that a citizen not connected with the service may be tried by a court-martial, for an offense against the civil law of the state only, seems to me in irreconcilable conflict with the constitution.    The custody of such a person, detained by military authority for such a trial,

can only be held legal upon the assumption that the President may abrogate that instrument.

Perhaps there are some who think that he may. I have seen much loose and dangerous reasoning upon this subject, which would perhaps go to that extent. Because the powers of government and military officers are greater in war than in peace, many seem to assume that therefore they have no limits. Because the war power may, in some instances, supersede for a time the general safeguards of the constitution, some seem hastily to infer that this may be done at all times, in all places, and under all circumstances. Because the President is required "to take care that the laws be faithfully executed," and to take an oath "to preserve, protect and defend the constitution," it seems to be supposed that he may do all possible acts which in his judgment would accomplish these ends, though such acts should require the assumption by him of legislative and judicial powers, and a disregard of all the provisions of the constitution. The principles at stake are too important for the question to be determined upon such reasoning.

The President, is of course, to take care that the laws are faithfully executed. But how? By what means? Only by such means as the constitution and the laws themselves have given him power to employ. That is, by causing proceedings to be instituted according to law, against those who violate the law, and by employing whatever force may be necessary to overcome all resistance that is offered to their execution. But he is to *execute* the laws, not to make or change them. And if their more perfect execution requires additional laws, prescribing new offenses, imposing new penalties, giving more enlarged powers to any officers, the President is wholly incompetent to provide this. It can be done by legislation only. So the oath to preserve and defend the constitution gives the President no additional powers. He cannot adopt all imaginable means that he might deem expedient for this purpose; but he is to defend it only by the use of such powers as the instru-

ment itself and the laws enacted under it, confer upon him. Any other construction of those provisions would destroy all the limitations of the constitution, and make it, after having divided the powers of the government into different departments, defeat its own provisions by substantially blending them all in one. Nor does the occurrence of war destroy the distinction between the different departments. They still remain as distinct as before, neither any more entitled than in peace, to assume the powers of the other. The powers of the legislature and of the executive are enlarged, but not blended. The President has still no power to prescribe new offenses, or new modes of punishment, or to order that citizens may be tried before tribunals which have no authority by law to try them. His duty is still only to execute the laws, by the modes which the laws themselves prescribe; to wage the war by employing the military power according to the laws of war. Those laws, as I have already conceded, may allow a military commander to declare martial law in districts which are the actual theatre of war, where hostile enemies are met for purposes of destruction; or in insurrectionary districts where domestic violence and discord have effectually displaced the civil authorities, so as to require an occupation by a military force for the preservation of order. I have conceded that where such martial law actually prevails, it renders the writ of *habeas corpus*, like all other civil process, incapable of enforcement, except at the will of the military chief. But whether within such limits it would be possible legally to try any citizen not in the service, for a mere civil offense, before a court-martial, I shall not now attempt to examine. The necessity for some kind of supervision over such offenders within such districts, may be extreme; yet, I confess I cannot readily reconcile such a power to try them, with the plain provision of the constitution, which evidently had reference to times of war as well as peace. But it is not necessary to consider that question here. For the existence of this kind of martial law, is itself limited

to places occupied by hostile forces, where actual conflict and violence are impending. I do not say that it is limited to the actual lines of a camp, though some have so held. The supreme court of Louisiana held that Gen. JACKSON, whose camp was four miles from New Orleans, could not extend martial law over the city. This may have been too strict a rule; but all authorities agree that it cannot be extended to those parts of the country which are not the theatre of the war, and where the civil authorities are in the undisturbed exercise of their ordinary functions. Such is the case in Wisconsin. If the power of creating martial law has any limits, this state has thus far been clearly outside of them. That it has none, is a proposition too terrible to be asserted. If that is so, war with an Indian tribe, war beyond the Rocky mountains, would lawfully empower the President to subject the whole Union to the government of martial law, or, in other words, to a military despotism, with no limit to the exercise of power, except his own judgment. I should regard the establishment of that doctrine as a settled principle of our law, as a calamity little, if any less, to be deplored than the success of the rebellion.

I have been compelled to consider what might have been the consequences of it, if that oligarchy which is now waging war upon the government, had remained in power, and turned this doctrine against the friends of freedom in this country. Suppose at the time of the Kansas difficulties, the Presidential chair had been occupied by the present head of the rebel government. He would have held, that those who were resisting the efforts to force slavery into that new state were waging war upon the constitution. And what wrong and oppression might he not have inflicted on the friends of liberty, if he had had the power to declare martial law over the whole country, suspend the writ of *habeas corpus*, arrest whomever he pleased for whatever acts he pleased to designate as offenses, and subject them to trial and punishment by a military court? If such things had occurred, I should have pronounced them wholly beyond

the powers of the President, either in peace or war.   I cannot say otherwise now, though such powers are assumed in a good cause, to aid in subduing those who are waging an unhallowed war not only on the constitution, but upon the rights of humanity, and by an executive who, I believe, has it not in his heart, to oppress or violate the rights of any human being.

I have read the argument of Judge Curtis, which has been published in pamphlet form, and so far as it relates to this power to declare martial law, it is presented with great force and clearness, and seems to me unanswerable. I do not assent to his position that the President or military commanders cannot, by any exercise of the war power, emancipate slaves in the rebellious states, for the reason that this would be an abrogation of the laws of such states.   I think this overlooks the distinction between divesting the title to property or to slaves, which are held under laws, and an abrogation of those laws. I think the former may occur without the latter.   A man's property may be divested by fines and forfeitures, yet the law under which they held it remain undisturbed.   And the same thing may be done by the war power.   But whether it can be done by the executive alone, or would require legislation, I am unprepared to say.   The point is utterly foreign to this inquiry, and I have alluded to it, only to say, that with this exception, the argument seems to me one of great ability and candor, and well worth the careful examination and hearty approval of every friend of constitutional liberty.   It has been criticised as overlooking the distinction between the powers of war and peace.   But this is wholly unfounded, for it clearly recognizes the enlarged powers which war brings, and claims only that they are not unlimited, that the constitution is still to be obeyed and enforced, except where the fury of actual war necessarily jostles it aside.

All acknowledge the terrible necessities of the war power; but the more terrible those necessities, the stronger is the argument for confining them strictly to the field of conflict.

Within those limits let the war power rage, controlled by nothing but the laws of war. But outside of them let the constitution, with all its safeguards, remain undisturbed. Let it stand, like the cities of refuge or the temples of the gods, a shield against illegal violence, even to the guiltiest traitor that ever raised his sacrilegious hand against it.

I must therefore say, that martial law does not prevail in Wisconsin, and that the proclamation of the President cannot legally authorize a military officer to hold the prisoner in custody for trial by a court-martial. Those courts have no jurisdiction to try any person except such as are *by law* amendable to such trial. In the case of *Smith vs. Shaw*, 12 Johns., 257, a case that occurred during the war of 1812, the defendant was held liable for detaining in custody a citizen who had been arrested by two officers of the army on charge of being a spy. The court said : " The conduct of the defendant in this case does not appear to have been harsh and oppressive. But it is the principle involved in it which renders the question important. If the defendant was justified in doing what he did, every citizen of the United States would, in time of war, be equally exposed to a like exercise of military power and authority. It was not pretended on the argument, that if the plaintiff was a citizen, he was amendable to a court-martial for any of the offenses alleged against him." Many other authorities might be cited to the same effect, and showing that courts-martial are courts of limited and inferior jurisdiction, and that if they pass beyond it their acts are void, and all who execute their sentences are trespassers.

I cannot dismiss the subject without alluding to one other position taken in the letter of the attorney general, before alluded to. He claims that the President has political powers, and the judiciary none ; that the President may, "in the exercise of his political discretion," arrest those whom he believes to be friends of and accomplices in the insurrection. And he then asserts that because the judicial department has no "po-

litical powers," no court or judge can take cognizance of the political acts of the President, or undertake to reverse his "political decisions." Of course the attorney general uses the word "political" in its higl er and true sense, meaning that which pertains to the government of a nation. In this sense sense it includes the entire system of its laws, constitutional and statutory. In the fundamental law, the people first establish the frame work of their political system. They establish the limitations and boundaries of power, and those principles which are to stand as permanent guides for the future action of the government. Within the limits thus established, tae subsequent politics of the nation are regulated by its laws. The executive, as a branch of the legislative department, has a voice in determining what these laws shall be. And if it is proper to apply the word political to any department of the government, the legislature is emphatically the political de-partment. The executive, as such, only executes the politics of the nation, that is, he executes the laws. Undoubtedly the constitution and laws do in many instances trust matters to the discretion of the executive. In such instances no other department can control the exercise of that discretion, but all are bound by it. But the difficulty in applying that doctrine in the manner attempted by the Attorney General, is, that the constitution and the laws have not entrusted to the executive, unless in cases where the writ of *habeas corpvs* is legally suspended, any political discretion to imprison the people. On the contrary, that matter was deemed of such vital importance, that the people regulated it, in the fundamental law of their politics, and provided that "no person shall be deprived of his life, liberty or property without *due process of law*." The constitution knows no "political" process, no political cause of imprisonment. There must be "a process of law," a legal cause of restraint. And the power to determine what is a legal imprisonment, and to discharge from any that is illegal, is, except when the writ is suspended, a power conferred on the judicial

department. And although the Attorney General expressly admits that the President has no judicial powers, yet when he claims for him the power to decide conclusively on the imprisonment of any person whom he or his subordinates may hold, and to exclude any inquiry into its legality by judicial tribunals, he does assert for him substantial judicial powers, and denies them to the department where they properly belong. If this doctrine is true, and the President and his subordinates are exempt from the operation of the writ, to the extent claimed by the Attorney General, it is difficult to see why the framers of the constitution should have conceived it to be necessary ever to suspend the writ at all.

The exemption from its operation, whether suspended or not, would be so complete, that it could never interfere with any imprisonment by direction of the executive. It is with surprise and sorrow that I have seen such a doctrine advanced by any officer of the United States. For it seems to me utterly destructive of the supremacy of the law, and of all our long cherished principles of civil liberty. I cannot but believe that it has been hastily asserted, without due consideration of its character, and that the President will decline to claim such exemption upon such grounds.

The question, then, is, whether an attachment should be awarded? Other judges, while holding similar opinions, have nevertheless, declined under similar circumstances, to issue an attachment, on account of the probable inability to enforce it, and of the inexpediency of producing a forcible collision in the present unhappy condition of the country, upon a question of difference between the executive and judicial departments either of the federal or state governments. I admit this inexpediency. I concede that such a collision should be avoided, and that the state, while expressing its opinion through its proper departments, that the imprisonment of its citizen is illegal, and that as a matter of strict law, it might rightfully employ its whole force to release him; yet, that in

view of the danger against which the government is contending, of the fact that we all have a common interest in its success, a common desire to uphold it in every legitimate exercise of power, even with our fortunes and our lives, and in view of the fact that we have faith in the sincerity and patriotism of the President, and that he has no desire to usurp unlawful authority over any man, but will upon further consideration voluntarily relieve us from this difficulty; I say, I concede, that in view of these things, the state may properly forbear to assert its right to relieve its citizen from illegal custody at the hazard of actual collision. My own impression, however would be, that this discretion should properly be exercised by that power, to whom the enforcement of the writ is entrusted. My brethren are of the opinion, however, that following the example of other judges, we may properly exercise it; and I have not seriously objected to a denial of the motion for an attachment, for the present at least, upon these grounds.