## IN RE MCDONALD ET AL.

(Nos. 3,540, 3,541, 3,542, 3,545, 3,546, 3,547.)

### IN RE GILLIS..

(No. 3,551.)

(Submitted September 17, 28, 1914. Decided October 8, 1914.)

[143 Pac. 947.]

*Habeas Corpus—State Militia—Martial Law—Power of Governor — Proclamation — Recitals—Conclusiveness—Insurrectionists—Arrest and Detention—Legality—Military Courts—Constitution—Statutes—Repeal.*

Martial Law—Insurrection—State Militia—Power of Governor.
    1. Under section 5, Article VII, of the Constitution, the governor has authority to proclaim the existence of a state of insurrection in any portion of the commonwealth and to detail the organized militia to suppress such insurrection, and neither the local authorities nor the supreme court may interfere with his determination in the matter, so long as he remains within the limits established by the Constitution.

    [As to martial law, see note in Ann. Cas. 1914C, 22. As to martial law other than in time of war, see note in 98 Am. St. Rep. 772.]

Same—Placing Troops in Charge of Local Authorities—Discretion.
    2. When the governor deems it advisable to call the state militia into active service to suppress an insurrection in a county, he may under

section 8967, Revised Codes (but need not), place the troops in charge of the local authorities.

Same—Proclamation—Recitals—Conclusiveness.
3. The recitals in the governor's proclamation that an insurrection exists in one of the counties of the state are conclusive, and the conditions thus proclaimed must be presumed to continue until by executive order it shall be otherwise declared.

Same—Arrest and Detention of Insurrectionists—Legality.
4. The state militia, while engaged in suppressing an insurrection pursuant to an order of the governor, may, when necessary to such suppression, arrest the insurrectionists and detain them in custody for delivery to the civil authorities at a time when the necessities of the case no longer require their detention.

Same—Habeas Corpus—Who may Suspend.
5. The suspension of the writ of *habeas corpus* is a legislative and not an executive function.

[As to the authority of *habeas corpus* as paramount to that of all other writs, see note in Ann. Cas. 1914A, 829.]

Same—Power of Governor—Limitations.
6. Though the governor may impose a degree of military rule upon a county in insurrection, he has no power to proclaim absolute martial law, which means the supremacy of the will of the military commander, the abrogation of all constitutional guaranties and state laws, and the conviction of civilians for crime by military commissions, without trial by jury.

[As to *habeas corpus* to inquire into legality of imprisonment by military authority, see note in Ann. Cas. 1914C, 30.]

Same—"Insurrection"—"War."
7. *Held*, that "insurrection" and "war" are not convertible terms.

Same—Military Courts—Unconstitutionality—Defense.
8. The possible prolongation of an insurrection is not any reason for upholding the summary trial of civilians by unconstitutional military courts, upon the argument of convenience that such course is preferable to their indefinite detention in custody.

[As to the distinction between martial law and military law, see note in 92 Am. Dec. 181.]

Same—State Militia—Statutes.
9. An Act which, upon submission to the people for their approval or rejection, is rejected, never was law for any purpose, hence the contention that the statute providing for the state militia (Rev. Codes, secs. 1045–1110) having been repealed by Chapter 145, Laws of 1911, which latter was in turn defeated on referendum, there is now no provision of law for a state militia because the defeat of Chapter 145 did not revive the original Act (Rev. Codes, sec. 122), *held* without merit.

Same—Habeas Corpus—Release of Petitioner—Denial, When.
10. Where an abortive attempt to try and punish petitioner for an alleged violation of the laws of the state is shown by the record, he is not, on *habeas corpus*, entitled to his release, but must be remanded to be dealt with according to law.

Applications for writs of *habeas corpus* by Mitchell McDonald, Owen Smith, Joseph Bradley, D. W. Malone, Ed Ross, James Chapman and Dan Gillis. Complainants remanded to the custody of respondents.

*Messrs. Maury, Templeman & Davies* and *Mr. I. G. Denny,* for Petitioners, submitted briefs; *Mr. H. L. Maury* and *Mr. Denny* argued the cause orally.

*Mr. D. M. Kelly,* Attorney General, and *Mr. Jesse B. Roote,* for Respondents, submitted a brief; *Mr. Roote* argued the cause orally.

MR. JUSTICE SANNER delivered the opinion of the court.

On September 1, 1914, the Honorable S. V. Stewart, governor of this state, issued his executive proclamation, as follows:

## "PROCLAMATION.

"Whereas, It has become apparent that conditions of lawlessness and defiance of authority prevail in the county of Silver Bow, State of Montana, and that combinations to resist the execution of process exist in said Silver Bow county, and that the power of the county has been exerted and has not been sufficient to enable the officers having process to execute it; and

"Whereas, It has been represented to me by properly constituted authorities that the peace officers of said county are unable to secure service of process and compliance with the law; and

"Whereas, It is made sufficiently to appear to me that peace and quiet cannot be re-established in said county of Silver Bow without the aid of some force other than the present constituted authority of said county;

"Now Therefore, I, S. V. Stewart, as Governor of the State of Montana, under and by virtue of the authority vested in me by the Constitution and the statutes of said state, do hereby proclaim the said county of Silver Bow, State of Montana, to be in a state of insurrection, and do hereby declare that said Silver Bow county, State of Montana, be and is hereby under martial law, and under the jurisdiction of the military authorities of said State of Montana, and such military forces as may be ordered into service to enforce the provisions of this proclama-

tion, shall be under the command of Major Dan J. Donohue, this proclamation to continue until the same shall be revoked or modified.

"And I do hereby call upon all citizens of said county and demand of them that they refrain from any and all acts that may in any way contribute to a continuance of disorder. They should desist from participating in gatherings upon the streets or in public places, mindful always of the danger that attends the assembling of large crowds of the idle and curious and of the fact that the innocent bystander is always in peril in the event of a clash between lawless and the forces of law and order. And I appeal to the sober-minded, peace-loving citizens of said county for co-operation with the proper authorities in any manner that will tend to a restoration of peace and quiet in that community.

"The forces of the state have been sent into said county upon the urgent demands of those who are entitled to be heard in an appeal for protection of life and property, and for the adjustment of conditions that have become intolerable and a stigma upon the fair name of our state. In the pursuit of this end these forces shall know neither organization nor faction, their sole aim being the re-establishment of peace in the county of Silver Bow. In the accomplishment of this purpose they should have the moral support of every person who values the stability, of government and the safety of life and property.

"In Witness Whereof I have hereunto set my hand and caused the Great Seal of the State to be affixed.

"Done at Helena, the Capital, this the First Day of September, in the Year of Our Lord One Thousand and Nine Hundred and Fourteen, and of the Independence of the United States the One Hundred Thirty-Ninth.

"(Signed)   S. V. STEWART.

"(The Great Seal of the State of Montana.)

"By the Governor.

"A. M. ALDERSON,

"Secretary of State."

In accordance with the above proclamation, military forces
of the state under the command of Major Dan J. Donohue, ar-
rived in Silver Bow county, took military possession thereof,
and such military possession has since continued and still con-
tinues.    On the 12th day of September, Mitchell McDonald,
Owen Smith, Joseph Bradley, E. W. Malone, Ed Ross and
James Chapman filed in this court their petitions for writs of
*habeas corpus*, alleging, in substance, that they were being un-
lawfully detained and restrained of their liberty by the governor
and by Major Donohue and certain other military officers of the
state who were named as respondents, in that the petitioners
had been arrested without warrant and were being held with-
out bail to be tried, without a jury, before an alleged court or
tribunal set up by the military authorities, upon charges to the
petitioners unknown; and this notwithstanding they had in-
fringed no law and were not members of the organized militia
of the state.    To these petitions, respondents made return
setting forth their official character, the proclamation of the
governor, and also a proclamation made by Major Donohue upon
his arrival in Silver Bow county with the military forces, and
alleging that said county was then in a state of insurrection;
that the emergencies of the situation demanded the arrest and
detention of the petitioners for the successful accomplishment
of the purpose for which said military authorities had been sent
into Silver Bow county by the governor, "such detention for the
present being necessary to prevent the petitioners from com-
mitting overt acts in defiance of the military authority of said
military forces"; that the said petitioners were leaders of those
engaged in insurrection and had been, and if discharged from
arrest would be active participants in fomenting and keeping
alive the condition of insurrection existing in Silver Bow
county; and that it is the purpose of the respondents to release
and discharge petitioners from military arrest as soon as that
can safely be done with reference to the suppression of the ex-
isting state of insurrection and then surrender them to the civil
authorities, to be dealt with in the ordinary course of justice

after such insurrection is suppressed. Upon the return and the evidence taken at the hearing, this court made an order denying the release of petitioners, with leave to re-petition after thirty days, if at that time they had not been delivered to the civil authorities and the courts were then open and able to execute their process. The reasons for that order will be set forth in the course of this opinion.

Thereafter, and on September 24, 1914, Dan Gillis filed his petition for a writ of *habeas corpus,* alleging unlawful detention and restraint by the same respondents, and that such detention and restraint are had and claimed by virtue of a commitment issued on September 21, 1914, by Jesse B. Roote, as major and judge of a certain summary court set up by the military authorities in Silver Bow county, after an alleged trial before said Jesse B. Roote without a jury, upon a charge of assaulting and resisting an officer, and in which said proceeding said Jesse B. Roote assumed to adjudge the petitioner guilty and to render judgment that he be imprisoned in the county jail in Silver Bow county, or any prison in said county, for the term of eleven months and pay a fine of $500; and all this notwithstanding all of the district courts of said Silver Bow county were, during the period covered by said proceeding and since have been, open and actively attending to business including the trial of causes. The effect of the return to this petition is to admit the detention of the petitioner under the commitment above mentioned; and such detention is sought to be defended upon the following grounds: That by the proclamation of the governor, martial law became established in Silver Bow county; that by the proclamation of Major Donohue the summary court above referred to was created, "and it was ordered that all acts which would constitute an offense or offenses under the penal laws of Montana or the ordinances of the city of Butte, as well as any act which would hinder or tend to hinder, delay or obstruct the work of the military forces in restoring order, should be punishable as offenses under the martial law, and that such punishments should be inflicted as in the judgment of said

officer constituting said summary court in cases of minor offenses should be suitable." It is also respectfully claimed "that the supreme court of Montana is without jurisdiction in the premises to discharge said Dan Gillis from arrest and imprisonment by reason of the facts and things hereinbefore recited." It will be readily noted that the position taken by the respondents in the *Gillis Case* is much broader than that presented by the returns in the causes first presented. The respondents now maintain "that the governor, as the chief executive officer of the state, has and had the authority, under the Constitution and statutes of the state, to issue the proclamation referred to, and to order the state troops into the district described therein, and that when the proclamation, as is the case here, declares absolute martial law, that of itself has the effect of suspending all governmental civil tribunals, and that the supreme authority and responsibility of government is thereby vested in the military forces; * * * and such military forces, in the discharge of the duties resting upon them, may establish courts for the trial of offenders who violate military orders or who violate the laws of the state within the troubled zone." The questions thus involved are extremely grave and far-reaching in effect.

A. That the governor had the authority to proclaim a state of [1] insurrection to exist in the county of Silver Bow and to detail the organized militia of this state to suppress such insurrection, is settled by the express language of our Constitution: "The supreme executive power of the state shall be vested in the governor, who shall see that the laws are faithfully executed. The governor shall be commander-in-chief of the militia forces of the state, * * * and shall have power to call out any part or the whole of said forces to aid in the execution of the laws, to suppress insurrection or to repel invasion." (Const., Art. VII, sec. 5.) Nor is there the slightest doubt that, as he must determine so he alone can determine when a state of insurrection exists and when the conditions require the interposition of military aid. Neither this court nor the local

authorities can be the arbiter in such a matter. Not this court, for it exercises judicial functions alone; and not the local authorities, for, although the enforcement of the law is primarily with them, public opinion and official attitude may be dominated by the forces who would take the law into their own hands. In every age and in every country there has come a time when portions of the people, roused to passion by some real or fancied cause, have sought by violence to enforce what they conceived to be their rights. When such an emergency arises it calls for prompt and effective action, for this is a government of law, and no permanent redress of grievances is possible through the wanton destruction of life or property. In such a situation the governor is not to be thwarted and his hands are not to be tied by the judgment of local authorities who may be overconfident or who may be acquiescent. "It may be said that this power is dangerous to liberty and may be abused. All power may be abused if placed in unworthy hands. But it would be difficult, we think, to point out any other hands in which this power would be more safe and at the same time equally effectual." (*Luther* v. *Borden*, 7 How. 1, 12, 48 L. Ed. 581.) In a case of insurrection it is not merely the local law that is set at naught—[2] it is the law of the state. Our Constitution places the responsibility for the maintenance of that law exactly where it belongs; our statutes recognize the fact in the provision that the governor may (but need not) put the militia in charge of the local authorities (Rev. Codes, sec. 8967), and it is the duty of this court to refrain from interference or question, so long as the governor remains within the limits established by the Constitution. [3] So much being true, the recitals in the proclamation that a state of insurrection existed in the county of Silver Bow cannot be controverted, but must be taken as final and conclusive. (*Martin* v. *Mott*, 12 Wheat, 19, 6 L. Ed. 537; *Luther* v. *Borden, supra; Moyer* v. *Peabody*, 212 U. S. 78, 53 L. Ed. 410, 29 Sup. Ct. Rep. 235; *Moyer* v. *Peabody*, 148 Fed. 870; *Franks* v. *Smith*, 142 Ky. 232, Ann. Cas. 1912D, 319, 134 S. W. 484; *In re Moyer*, 35 Colo. 159, 117 Am. St. Rep. 189, 12 L. R. A. (n. s.)

979, 85 Pac. 190; *Barcelon* v. *Baker,* 5 Philippines Rep. 87; *Re Boyle,* 6 Idaho, 609, 96 Am. St. Rep. 286, 45 L. R. A. 832, 57 Pac. 706; *Ex parte Moore,* 64 N. C. 802.)    For reasons equally cogent, we must presume the conditions, thus proclaimed, to continue until by executive order or proclamation it shall be otherwise declared.    (*Barcelon* v. *Baker, supra.*)

Premising, then, that Silver Bow county was and is in a state of insurrection, and that the presence of the organized militia [4]    was and is necessary to the permanent restoration of order, what has that to do with the arrest and detention of McDonald and his copetitioners?   We think it has much to do under any and every theory that may  possibly be entertained  touching  the power of the governor and the militia in cases of insurrection. It was distinctly asserted in the returns and established to our satisfaction by the evidence taken upon the hearing, that Mc- Donald and his copetitioners had not been arrested and were not being held for trial before any court-martial or other military tribunal, but that they had been arrested as leaders and inciters of the insurrection, and were being held as necessary measures. for its suppression, to be turned over to the civil authorities for trial as soon as that could safely be done.   After a considera- tion of all that was said in argument and of practically all the accessible literature on the subject, we are convinced that the theory which accords the least power to the governor and to the militia in cases of insurrection is that he acts as a civil officer of the state, and that the military forces under him operate as a sort of major police for the restoration of public order; and we confidently assert that under this theory the arrest and de- tention, under the circumstances stated, can be justified and must be upheld.

The return to the writs issued on behalf of McDonald and his copetitioners is in exactly the same terms as that presented in the *Moyer Case,* cited above, and  touching  its efficacy the supreme court of Colorado said: "Are the arrest and detention of petitioner under the facts narrated illegal?   When an ex- press power is conferred, all necessary means may be employed

to exercise it, which are not expressly or impliedly prohibited. (1 Story's Constitution, sec. 434.) Laws must be given a reasonable construction, which, so far as possible, will enable the end thereby sought to be attained. So with the Constitution. It must be given that construction of which it is susceptible which will tend to maintain and preserve the government of which it is the foundation, and protect the citizens of the state in the enjoyment of their inalienable rights. In suppressing an insurrection, it has been many times determined that the military may resort to extreme force as against armed and riotous resistance, even to the extent of taking the life of the rioters. Without such authority, the presence of the military in a district under the control of the insurrectionists would be a mere idle parade, unable to accomplish anything in the way of restoring order or suppressing riotous conduct. If, then, the military may resort to the extreme of taking life in order to suppress insurrection, it is impossible to imagine upon what hypothesis it can be successfully claimed that the milder means of seizing the persons of those participating in the insurrection or aiding and abetting it may not be resorted to. This is but a lawful means to the end to be accomplished. The power and authority of the militia in such circumstances are not unlike that of the police of a city, or the sheriff of a county, aided by his deputies or *posse comitatus* in suppressing a riot. Certainly such officials would be justified in arresting the rioters and placing them in jail without warrant, and detaining them there until the riot was suppressed. * * * If, as contended by counsel for petitioner, the military, as soon as a rioter or insurrectionist is arrested, must turn him over to the civil authorities of the county, the arrest might, and in many instances would, amount to a mere farce. He could be released on bail, and left free to again join the rioters or engage in aiding and abetting their action, and, if again arrested, the same process would have to be repeated, and thus the action of the military would be rendered a nullity. * * * Again, if it be conceded that, on the arrest of a rioter by the military, he must at once be turned

over to the custody of the civil officers of the county, then the military, in seizing armed insurrectionists and depriving them of their arms, would be required to forthwith return them to the hands of those who were employing them in acts of violence, or be subject to an action of replevin for their recovery, whereby immediate possession of such arms would be obtained by the rioters, who would thus again be equipped to continue their lawless conduct. To deny the right of the militia to detain those whom they arrest while engaged in suppressing acts of violence and until order is restored, would lead to the most absurd results. The arrest and detention of an insurrectionist, either actually engaged in violence or in aiding and abetting others to commit such acts, violates none of his constitutional rights. He is not tried by any military court, or denied the right of trial by jury; neither is he punished for violation of the law, nor held without due process of law. His arrest and detention in such circumstances are merely to prevent him from taking part or aiding in a continuation of the conditions which the governor, in the discharge of his official duties and in the exercise of the authority conferred by law, is endeavoring to suppress."

After his release, Moyer brought a civil action in the circuit court of the United States for the district of Colorado, to secure damages for his arrest and imprisonment, and that court, in sustaining a demurrer to the complaint, remarked: "The state Constitution enjoined the governor, as such officer, to put down the insurrection. The situation must have been more or less desperate and required prompt action, effective of the purpose. Measures are sometimes necessary under the police power that are severe, such as the summary destruction of property used for an unlawful purpose (*Lawton* v. *Steele,* 152 U. S. 133, 38 L. Ed. 385, 14 Sup. Ct. Rep. 499); such as treating property used in an unlawful traffic as a nuisance (*Mugler* v. *Kansas,* 123 U. S. 623, 31 L. Ed. 205, 8 Sup. Ct. Rep. 273; *Kidd* v. *Pearson,* 128 U. S. 1, 32 L. Ed. 346, 9 Sup. Ct. Rep. 6); such as the summary destruction of property to stay conflagration (*Bowditch* v. *Boston,* 101 U. S. 16, 25 L. Ed. 980); such as the sum-

mary destruction of obscene books and diseased cattle (*Sentell v. New Orleans etc. R. R. Co.*, 166 U. S. 698, 41 L. Ed. 1169, 17 Sup. Ct. Rep. 693) ; such as the restraint of personal liberty in passing either into or out of an infected district, for the extermination of contagion (*Compagnie Francaise etc. v. Louisiana State Board of Health*, 186 U. S. 380, 40 L. Ed. 1209, 22 Sup. Ct. Rep. 811),—and the prohibitions found in the Fourteenth Amendment have never been construed to be an encroachment on such a proper exercise of that power; neither is it believed that said prohibitions can be so construed as an encroachment upon the exercise of the military power within the lines here indicated—invoked to protect the very life of the social body. In both cases we find their right and justification in the maxim, '*Salus populi, suprema lex.*' '' (*Moyer v. Peabody*, 148 Fed., *supra.*)

The cause last mentioned was appealed to the supreme court of the United States and was affirmed, Mr. Justice Holmes speaking as follows: ''Of course, the plaintiff's position is that he has been deprived of his liberty without due process of law. But it is familiar that what is due process of law depends on circumstances. It varies with the subject matter and the necessities of the situation. Thus summary proceedings suffice for taxes, and executive decisions for exclusion from the country. (*Murray v. Hoboken Land & Improvement Co.*, 18 How. 272, 15 L. Ed. 372; *United States v. Ju Toy*, 198 U. S. 253, 263, 49 L. Ed. 1040, 25 Sup. Ct. Rep. 644.) What, then, are the circumstances of this case? * * * The facts that we are to assume are that a state of insurrection existed and that the governor without sufficient reason but in good faith, in the course of putting the insurrection down, held the plaintiff until he thought that he safely could release him. * * * In such a situation we must assume that he had a right under the state Constitution and laws to call out troops, as was held by the supreme court of the state. The Constitution is supplemented by an Act providing that 'when an invasion of or insurrection in the state is made or threatened, the governor shall order the

49 Mont.—30

national guard to repel or suppress the same.' (Laws 1897, Chap. 63, Art. VII, sec. 2, p. 204.) That means that he shall make the ordinary use of the soldiers to that end; that he may kill persons who resist and, of course, that he may use the milder measure of seizing the bodies of those whom he considers to stand in the way of restoring peace. Such arrests are not necessarily for punishment, but are by way of precaution to prevent the exercise of hostile power." (*Moyer* v. *Peabody,* 212 U. S., *supra.*)

·The reasoning of these cases, properly understood and strictly confined to its proper sphere, we take to be unanswerable, and to be entirely applicable to the right and duty of the governor and the militia, under our Constitution and laws. The release of McDonald and his copetitioners was therefore denied; but since the justification is necessity, and since it cannot obtain beyond the period of such necessity, we granted leave to reapply, having in mind that the course of events might or might not demonstrate the detention of these petitioners beyond the time indicated to be unnecessary.

B. Does it follow, then, that the governor can suspend the **[5]** writ of *habeas corpus,* declare martial law and authorize the creation of military tribunals to try citizens for violations of the laws of the state? It should be said in justice to the governor that he has not attempted to suspend the writ of *habeas corpus,* and we should not refer to the subject but for the claim urged upon the return in *Gillis' Case:* that this court is without jurisdiction to order a release. This claim can, of course, have no basis save upon the theory that the governor, having declared martial law, *ipso facto* suspended the writ of *habeas corpus.* Certain decisions were presented which sustain this view (*Ex parte Moore, supra; State* v. *Brown,* 71 W. Va. 519, Ann. Cas. 1914C, 1, 45 L. R. A. (n. s.) 996, 77 S. E. 243; *Ex parte Jones,* 71 W. Va. 567, Ann. Cas. 1914C, 31, 45 L. R. A. (n. s.) 1030, 77 S. E. 1029; *Ex parte Field,* 5 Blatchf. 63, 9 Fed. Cas. 1) ; but we do not care to discuss them, for it has been the settled law of this country ever since 1807 that the suspension of the writ of *habeas corpus* is a legislative and not an executive function. (*Ex parte*

*Bollman,* 4 Cranch, 75, 2 L. Ed. 554; *Ex parte Merryman,* Taney, 246, Fed. Cas. No. 9487; *Ex parte Milligan,* 4 Wall. 2, 18 L. Ed. 281; *Johnson* v. *Duncan,* 3 Mart. (La.) 530, 6 Am. Dec. 675; *Ex parte Benedict,* Fed. Cas. No. 1292; *McCall* v. *McDowell,* 1 Abb. (U. S.) 212, Fed. Cas. No. 8673; *In re Kemp,* 16 Wis. 359; *Ex parte Moore, supra.*) If, therefore, the power to suspend that writ must stand or fall with the power to establish absolute martial law, the inference is inevitable that no such *régime* can be established by the executive.

We prefer, however, to rest our conclusion upon other [6] grounds. Absolute martial law, the character of rule which respondents claim to have been established in Silver Bow county, means nothing more nor less than the will of the military commander in the field. It ''confers power of arrest, of summary trial and prompt execution; and when it has been proclaimed, the land becomes a camp, and the law of the camp is the law of the land.'' (Webster, in *Luther* v. *Borden,* 5 Works, 240.) Such is the understanding of it as entertained by counsel for respondents, who in oral argument asserted that it meant the abrogation, for the time being, of all the constitutional guaranties and of all the statutes of the state, and in whose brief we find authorities to similar effect. (*In re Ezeta,* 62 Fed. 972, 1002; *In re Egan,* 5 Blatchf. 319, 8 Fed. Cas. (No. 4303) 367; *Commonwealth* v. *Shortall,* 206 Pa. 165, 98 Am. St. Rep. 759, 65 L. R. A. 193, 55 Atl. 952.) Some logical difficulty might be met in conceiving how a constitutional officer can constitutionally suspend the Constitution, or how any tribunal can try men for the violation of laws whose force and effect are for the time being in abeyance. But we pass these and state the question to be this: Is it possible for the executive, by proclamation or otherwise, to constitutionally establish in this state any form of martial law which will authorize the conviction of a civilian for crime, without trial by jury? The answer may be found in almost every page of Anglo-Saxon history since 1628. Prior to that time the crown had on various occasions attempted to extend the operation of martial law, either by applying it in time of peace

or to nonmilitary persons or to nonmilitary offenses. Finally, the issuance by James I and Charles I of commissions to proceed under martial law for the purpose, not only of maintaining the discipline of the army, but also for bringing to more speedy punishment any crimes of whatsoever nature committed by civilians of a certain class, led to the historic Petition of Right in the year above mentioned. In the debate which occurred in the House of Commons on that occasion, the right to proclaim martial law was thoroughly discussed, and the views of such high authorities as Rolle and Coke were stated by the former as follows: "Martial law is merely for necessity when the common law cannot take place. * * * If an enemy come into any part where the common law cannot be executed, there may martial law be executed. If a subject be taken in rebellion, if he be not slain at the time of his rebellion, he is to be tried afterward and by the common law." Fifty years later, Sir Matthew Hale insisted that "martial law is not a law but something indulged rather than allowed as a law. The necessity of government, order and discipline in an army is that only which can give it countenance. * * * Secondly, this indulged law is only to extend to members of the army and to those of the opposite army, and never may be so much indulged as to be exercised or executed upon others. Thirdly, the exercise of martial law may not be permitted in times of peace when the king's courts are open." (History of the Common Law, Chap. XI.) These words are echoed, with illustrations, by Blackstone, from whom we may always learn the state of the common law at the time our Constitution was adopted. (1 Hammond's Blackstone, 695.) Nor has any other view ever prevailed among the jurists and publicists of England. In *Grant* v. *Gould,* Lord Loughborough said: "Martial law such as is described by Hale, and such also as it is marked by Mr. Justice Blackstone, does not exist in England at all." And it is a notable fact that martial law has not been proclaimed in England since 1689—neither in the Jacobite risings nor in the Gordon riots in the eighteenth century, nor in the disturbances which occurred at various times

in the nineteenth century. It is quite true that in Ireland, in 1798, and in the different British colonies since then, martial law has been proclaimed on several occasions, and the right to do so has been the subject of much parliamentary discussion. The prevalent view in these discussions seems to have been the one expressed by Lord Cardwell on the Jamaica troubles of 1867. He said that "while there was properly no such thing as martial law, there was no doubt a law of necessity which required that certain acts should be done for the suppression of the rebellion but not for the punishment of persons concerned in it. * * * The law of necessity to which he had referred was strictly limited in time and operated only for repression and not for punishment." The views above expressed were strongly enforced in 1867 by Justice Blackburn in *Queen* v. *Eyre,* and by Chief Justice Cockburn in *Queen* v. *Nelson.*

The sort of martial law for which respondents now contend is regarded in England as a strictly continental institution. It is applied by declaring the affected locality in "the state of siege" wherein "the constitutional guaranties are suspended." Professor Dicey comments upon it as follows: "This kind of martial law is in England utterly unknown to the constitution. Soldiers may suppress a riot as they may resist an invasion; they may fight rebels just as they might fight foreign enemies; but they have no right under the law to inflict punishment for riot or rebellion." (Dicey, Law of the Constitution, 381.) If they cannot inflict punishment for riot or rebellion, they cannot inflict it for any other offense against the municipal law.

Turning to our own country, we note that when the Constitution was adopted, the common law on the subject was as stated by Justice Blackstone. We may also recall that there was a very keen appreciation and jealousy of their personal rights on the part of our forefathers—a jealousy which had been in part directed to this very subject of martial law by the acts of General Gage in New England and of Governor Dunmore in Virginia. It is also well known that when the national Constitution was submitted to the people, over one-third of the vote

was against it, and many of the favorable votes it received were cast with much misgiving, due to the fact that it did not put in positive terms those safeguards to which the people "had been long accustomed to have interposed between them and the magistrate who exercises sovereign power." (Madison, Annals First Congress, 450.) It was explained that the Constitution was to be a grant of power, and therefore powers not expressly granted were reserved to the people, but "this explanation satisfied not one state." (Bancroft's History Formation of Constitution, p. 383 *et seq.*) The general attitude was expressed by Jefferson, who, after extolling the merits of the new plan, added: "I will now tell what I do not like: First, the omission of a bill of rights, providing clearly and without aid of sophism for freedom of religion, freedom of the press, protection against standing armies, restriction of monopolies, the eternal and unremitting force of the *habeas corpus* laws, and trial by jury in all matters of fact triable by the laws of the land, and not by the law of nations." (2 Jefferson's Works, 329.) Eight states coupled their assent with a demand for such a bill of rights— thus clearly was it insisted that trial by jury should be guaranteed in every case then triable by jury at the common law; and as the common law did not then authorize violations of the laws of the land to be tried by military commission, it follows that the guaranty of trial by jury as contained in Amendment VI must be taken in this sense.

And such we find to be the result of the adjudicated cases arising under the national Constitution. It would extend this opinion to inordinate length to review them all, and we shall therefore content ourselves with a brief reference to a few whose meaning cannot be doubted. *Smith* v. *Shaw,* 12 Johns. (N. Y.) 257, arose out of an arrest for trial by court-martial during the war of 1812, and the supreme court of New York in disposing of an attempted plea of justification under the martial law said: "It is a general rule that where a court has neither jurisdiction of the subject matter nor of the person, everything done is absolutely void. * * * None of the offenses charged

against Shaw were cognizable by a court-martial except that which related to his being a spy; and if he was an American citizen, he could not be charged with such an offense. He might be amenable to civil authority for treason, but could not be punished under martial law as a spy. There was therefore a want of jurisdiction either of the person or of the subject matter as to all offenses alleged against the plaintiff.'' To the same effect is *McConnell* v. *Hampton,* 12 Johns. (N. Y.) 243.

*Johnson* v. *Duncan,* 3 Mart. (La.) 530, 6 Am. Dec. 675, arose out of the declaration by General Jackson of martial law in the city of New Orleans, and the supreme court of Louisiana touching that matter declared: ''If it be said that the laws of war, being the laws of the United States, authorize a proclamation of martial law, I answer that in peace or in war no law can be enacted but by the legislative power.''

The next war fought upon our own soil was the great rebellion, and, as might have been expected, it gave rise to much controversy and discordance of opinion touching the scope and power of martial law. All this, however, was set at rest by the great decision of the supreme court of the United States in the *Milligan Case,* wherein all that is now asserted by respondents was urged upon the court and from which decision we quote: ''The Constitution of the United States is a law for rulers and people, equally in war and in peace, and covers with the shield of its protection all classes of men, at all times, and under all circumstances. No doctrine, involving mere pernicious consequences, was ever invented by the wit of man than that any of its provisions can be suspended during any of the great exigencies of government. * * *

''Every trial involves the exercise of judicial power; and from what source did the military commission that tried him derive their authority? Certainly no part of the judicial power of the country was conferred on them; because the Constitution expressly vests it 'in one supreme court and such inferior courts as the Congress may from time to time ordain and establish,' and it is not pretended that the commission was a court ordained

and established by Congress. They cannot justify on the mandate of the President; because he is controlled by law, and has his appropriate sphere of duty, which is to execute, not to make, the laws; and there is 'no unwritten criminal code to which resort can be had as a source of jurisdiction.'   *   *   *

"Why was he not delivered to the circuit court of Indiana to be proceeded against according to law? No reason of necessity could be urged against it; because Congress has declared penalties against the offenses charged, provided for their punishment, and directed that court to hear and determine them.   *   *   *
If it was dangerous, in the distracted condition of affairs, to leave Milligan unrestrained of his liberty, because he 'conspired against the government, afforded aid and comfort to rebels, and incited the people to insurrection,' the law said arrest him, confine him closely, render him powerless to do further mischief; and then present his case to the grand jury of the district, with proofs of his guilt, and, if indicted, try him according to the course of the common law. If this had been done, the Constitution would have been vindicated, the law of 1863 enforced, and the securities for personal liberty preserved and defended.

"Another guaranty of freedom was broken when Milligan was denied a trial by jury. The great minds of the country have differed on the correct interpretation to be given to various provisions of the federal Constitution, and judicial decision has been often invoked to settle their true meaning; but until recently no one ever doubted that the right of trial by jury was fortified in the organic law against the power of attack. It is now assailed; but if ideas can be expressed in words, and language has any meaning, this right—one of the most valuable in a free country—is preserved to everyone accused of crime who is not attached to the army, or navy, or militia in actual service.   *   *   *   All other persons, citizens of states where the courts are open, if charged with crime, are guaranteed the inestimable privilege of trial by jury. This privilege is a vital principle, underlying the whole administration of criminal jus-

tice; it is not held by sufferance, and cannot be frittered away on any plea of state or political necessity.    *    *    *

"It is claimed that martial law covers with its broad mantle the proceedings of this military commission. The proposition is this: that in a time of war the commander of an armed force (if in his opinion the exigencies of the country demand it, and of which he is to judge), has the power, within the lines of his military district, to suspend all civil rights and their remedies, and subject citizens as well as soldiers to the rule of his will; and in the exercise of his lawful authority cannot be restrained, except by his superior officer or the President of the United States. If this position is sound to the extent claimed, then when war exists, foreign or domestic, and the country is subdivided into military departments for mere convenience, the commander of one of them can, if he chooses, within his limits, on the plea of necessity, with the approval of the Executive, substitute military force for and to the exclusion of the laws, and punish all persons, as he thinks right and proper, without fixed or certain rules. The statement of this proposition shows its importance; for, if true, republican government is a failure, and there is an end of liberty regulated by law. Martial law, established on such a basis, destroys every guaranty of the Constitution, and effectually renders the 'military independent of and superior to the civil power'—the attempt to do which by the king of Great Britain was deemed by our fathers such an offense, that they assigned it to the world as one of the causes which impelled them to declare their independence. Civil liberty and this kind of martial law cannot endure together; the antagonism is irreconcilable; and, in the conflict, one or the other must perish."

As pointed out by an eminent military authority, there is nothing in *Mitchell* v. *Clark*, 110 U. S. 633, 28 L. Ed. 279, 4 Sup. Ct. Rep. 170, or in any subsequent decision of the supreme court, to break the force of the Milligan decision. (Union College Lectures, Clous on Military and Martial Law.)

We are quite aware that as indicated by Chief Justice Marshall in *Barron* v. *Baltimore*, 7 Pet. 243, 8 L. Ed. 672, the guar-

anties contained in the fifth and sixth amendments to the national Constitution are limitations upon the power of the United States, and not upon the power of the states; but the interpretation of them serves to show how they were understood in that behalf and to furnish a guide to the proper understanding of like guaranties contained in Article III of our state Constitution. (*Ex parte Moore, supra; Franks* v. *Smith, supra; Johnson* v. *Duncan, supra; Johnson* v. *Jones,* 44 Ill. 142, 92 Am. Dec. 159; *Sheean* v. *Jones,* 44 Ill. 167; *Carver* v. *Jones,* 45 Ill. 334; *In re Kemp, supra.*)

It is insisted, however, that under all the decisions the executive can establish martial law in time of war when the ordinary [7] tribunals are not open; that an insurrection is war, and that the proof at bar shows the civil tribunals of Silver Bow county to have been closed. When in domestic territory the laws of the land have become suspended, not by executive proclamation but by the existence of war, the executive may supply the deficiency by such form of martial law as the situation requires, but we deny that insurrection and war are convertible terms.

The term "war" is used in the books, not in its popular but in its legal sense, and only the national Congress can declare or recognize the existence of war. There is a very great distinction between insurrection and war. It is this: War is an act of sovereignty, real or assumed; insurrection is not. War makes enemies of the inhabitants of the contending states; but insurrection does not put beyond the pale of friendship the innocent in the affected district. War creates the rights and duties of belligerency, which to a mere insurrection are unknown. Doubtless an insurrection may become war, as was the case with the great rebellion, but it does not become so in the legal sense until the rebellious party assumes political form. This was pointed out by the supreme court of the United States in the *Prize Cases,* 2 Black (U. S.), 635, 673, 17 L. Ed. 459. "In organizing this rebellion, they have *acted as states,* claiming to be sovereign over all persons and property within their respective limits, and asserting a right to absolve their citizens from their allegiance

to the federal government. Several of these states have combined to form a new confederacy, claiming to be acknowledged by the world as a sovereign state. * * * It is no loose, unorganized insurrection, having no defined boundary or possession. It has a boundary marked by lines of bayonets, and which can be crossed only by force—south of this line is enemies' territory, because it is claimed and held in possession by an organized, hostile and belligerent power." In internal wars the object is to coerce the power opposed to the sovereign, and because such power exercises jurisdiction and control *de facto* and claims it *de jure* over the territory under its sway, it is competent for the sovereign to exercise powers belonging to belligerents at international law. (*Miller* v. *United States*, 11 Wall. 268, 20 L. Ed. 135; *Rose* v. *Himely*, 4 Cranch, 241, 272, 2 L. Ed. 608; *Santissima Trinidad*, 7 Wheat. 283, 5 L. Ed. 454; Taylor, International Public Law, secs. 449, 450.)

How inapplicable all this is to a formless insurrection and how impossible to characterize such a movement as a state of war, with all its powers and immunities, is pointed out by Mr. Justice Nelson in the *Prize Cases* cited: "It has been argued that the authority conferred on the President by the Act of 1795 invests him with the war power. But the obvious answer is, that it proceeds from a different clause in the Constitution and which is given for different purposes and objects, namely, to execute the laws and preserve the public order and tranquillity of the country in a time of peace by preventing or suppressing any public disorder or disturbance by foreign or domestic enemies. Certainly, if there is any force in this argument, then we are in a state of war with all the rights of war, and all the penal consequences attending it every time this power is exercised by calling out a military force to execute the laws or to suppress insurrection or rebellion; for the nature of the power cannot depend upon the numbers called out. * * * The truth is, this idea of the existence of any necessity for clothing the President with the war power, under the Act of 1795, is simply a monstrous exaggeration."

It was also the general belief when the sixth amendment to the national Constitution was under consideration, that trial by jury could not be denied on account of any mere local disturbance. This is evidenced by the fact that in the first draft of that amendment as presented by Madison, in the second draft as presented by the congressional committee of eleven, and in the third draft as reported by the special committee of three, provision was specifically made for trials by jury out of the vicinage when the vicinage should be in a state of insurrection. (Thorpe, Const. Hist. U. S., vol. II, pp. 199 *et seq.*)

So far as the right to trial by jury in case of insurrection is concerned, it does not seem to us vitally important whether the courts are or are not open when the military appear. It may be granted that courts which are prevented by insurrection from executing their process are not open in contemplation of the law. To open them is a part of the duty devolving upon the military. It was conceded at bar that some of the courts of Silver Bow county are in operation, though it was insisted to be only such as are permitted by the military authorities, the others being closed by their order. No such cloture can be recognized.

We have somewhere met with the argument that because the insurrection may be prolonged, the summary trial of offenders is [8] preferable to their indefinite detention. This is not even an argument from necessity, but from convenience only. We know of but one court of last resort which gives it any countenance and that court we do not choose to follow. Nor are we impressed with the suggestion that military trials are necessary in Silver Bow county because the state of public feeling would render trials by jury ineffective—that the guilty will not be punished. We are loath to believe that the courts and citizenship of that county are so weak as this; but if they are, ample relief is afforded the state by the statutory provisions for change of venue.

Martial law, however, is of all gradations, and although the governor cannot by proclamation or otherwise establish martial law of the character above discussed, he is not barred from de-

claring it in any form. We must therefore assume that in using that phrase in his proclamation, he meant only such degree or form of martial rule as he was constitutionally authorized to impose. As we have seen above, he was authorized to detail the militia to suppress the insurrection and to direct their movements without regard to the civil authorities, and they could in the performance of their work take such measures as might be necessary, including the arrest and detention of the insurrectionists and other violators of the law, for delivery to the civil authorities; but neither he nor the military under him can lawfully punish for insurrection or for other violations of the law. The courts cannot be ousted by the agencies detailed to aid them; nor can their functions be transferred to tribunals unknown to the Constitution.

A very brief notice will suffice for the contention that in consequence of the passage of the Donohue bill by the legislature, [9] which was subsequently defeated on referendum, we have no organized militia in this state, and therefore all that has been done was illegal. There is nothing in this. The militia of this state consists of all its able-bodied citizens between the ages of eighteen and forty-five years, with certain exceptions. (Const., Art. XIV, sec. 1.) The governor was authorized to call any or all of them to quell the insurrection, without regard to whether they belonged to the national guard or not. But we have an organized militia. The passage of the Donohue bill by the legislature was not final and never became effective by virtue of the referendum. It required the approval of the people before becoming a law, and this it never had. If it did not become a law for constructive purposes, it could not be one for repealing purposes. (*State ex rel. Hay* v. *Alderson,* 49 Mont. 387, 142 Pac. 210.)

The trial and commitment of petitioner Gillis were void and his [10] detention thereunder cannot be upheld. But he is not entitled to his release. The record discloses an abortive attempt to try and punish him for an alleged violation of the laws of the state. He must, therefore, be remanded to the custody of

respondents to be dealt with according to law. (*In re Jones,* 46 Mont. 122, 126 Pac. 929.) It is so ordered.

Mr. Chief Justice Brantly and Mr. Justice Holloway concur.

Rehearing denied November 5, 1914.